# EXHIBIT A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
GSV ASSET MANAGEMENT, LLC, a Delaware limited liability company; SURO CAPITAL CORP., a Maryland Corporation; MARK D. KLEIN, an individual; MICHAEL T. MOE, an individual; DOES

**Electronically**
**FILED**
by Superior Court of California, County of San Mateo
ON
12/30/2022
By    **/s/ Jennifer Torres**
**Deputy Clerk**

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
STEPHEN D. BARD

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  San Mateo Superior Court, 400 County Center, Redwood City, CA 94063 | CASE NUMBER: *(Número del Caso):*<br>22-CIV-05520 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

William J. Edelman (SBN 285177), Delahunty & Edelman LLP, 4 Embarcadero Center, Suite 1400, San Francisco, CA 94111

| DATE:<br>*(Fecha)* | 12/30/2022 | Neal I. Taniguchi | Clerk, by<br>*(Secretario)* | /s/ Jennifer Torres | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courts.ca.gov |
|---|---|---|

1   PATRICK R. DELAHUNTY (CA Bar No. 257439)
    pdelahunty@delawllp.com
2   WILLIAM J. EDELMAN (CA Bar No. 285177)
    wedelman@delawllp.com
3   DELAHUNTY & EDELMAN LLP
    4 Embarcadero Center, Suite 1400
4   San Francisco, CA 94111
    Tel:    (415) 891-6210
5   Fax:    (415) 891-6256

6   *Attorneys for Plaintiff Stephen D. Bard*

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON 12/30/2022
By    */s/ Jennifer Torres*
         Deputy Clerk

9              SUPERIOR COURT OF CALIFORNIA

10                COUNTY OF SAN MATEO

11               UNLIMITED JURISDICTION

12
                                            22-CIV-05520
13  STEPHEN D. BARD,                    CASE NO. _____

14          Plaintiff,                  **COMPLAINT FOR DAMAGES:**

15      v.                              (1) Breach of Written Contract
                                        (2) Breach of Implied Covenant of Good Faith
16  GSV ASSET MANAGEMENT, LLC a             and Fair Dealing
    Delaware limited liability company; SURO   (3) Reformation
17  CAPITAL CORP., a Maryland corporation;     (4) Fraud
    MARK D. KLEIN, an individual; MICHAEL T.   (5) Aiding and Abetting Fraud
18  MOE, an individual; and DOES 1 TO 99,      (6) Intentional Interference with Contractual
                                                   Relations
19          Defendants.                 **JURY DEMAND**

20

21

22

23

24

25

26

27

28

CASE NO. _____                                      COMPLAINT

This action arises from the termination of a business partnership.  Plaintiff Stephen D. Bard ("Bard" or "Plaintiff") co-founded Defendant GSV Asset Management, LLC ("GSVAM" or the "Company") along with another individual, Defendant Michael T. Moe ("Moe").  Since its founding, GSVAM's biggest client and largest source of revenue was Defendant SuRo Capital Corp. ("SuRo"), formerly known as GSV Capital Corp.  Bard and Moe also co-founded GSV Capital Corp.  In 2014, after a dispute between Bard and Moe, Moe ultimately pushed Bard out of an operational role at GSVAM.  This led to further disputes, which Bard and GSVAM ultimately settled by executing a written Repurchase Agreement dated September 18, 2017 (the "Repurchase Agreement").  Defendant Mark D. Klein ("Klein"), then a consultant to GSVAM and also the Chief Executive Officer of SuRo, negotiated the Repurchase Agreement on behalf of GSVAM.

Under the Repurchase agreement, Bard agreed to sell his interest in GSVAM back to GSVAM. In exchange, GSVAM agreed to pay Bard $5 million.  Payment of that purchase price was split between an up-front payment and monthly recurring payments thereafter until the full payment price was satisfied.

Beginning in September 2022 and thereafter, GSVAM failed to honor its payment commitments by unilaterally ceasing all monthly payments.  GSVAM still owes Bard over $1.8 million.  GSVAM purportedly is unable to make payments in part because of decisions made by SuRo.  Specifically, in 2019, SuRo terminated its contract with GSVAM and internalized the functions previously served by GSVAM.  It was apparently able to do this by hiring away GSVAM personnel to perform the same functions that had been previously provided by GSVAM, but instead would now be performed in-house at SuRo.  That, according to GSVAM, resulted in massive revenue losses to GSVAM.

By this Complaint, Plaintiff seeks redress for GSVAM's failure to honor its obligations to make the monthly payments it agreed to in exchange for Bard's interest in the Company, and SuRo's intentional interference with Bard's Repurchase Agreement with GSVAM.

## PARTIES

1.      Plaintiff is a resident of Incline Village, County of Washoe, Nevada.  Plaintiff is an investment and financial professional with experience serving in senior roles at companies and

CASE NO. _____                                                                                          COMPLAINT

investment funds and firms, including Chief Operating Officer, Chief Financial Officer, and Chief Compliance Officer.

2.     On information and belief, Defendant GSVAM is a Delaware limited liability company with its principal place of business in Woodside, California.  GSVAM is an investment management firm servicing accredited institutions and high-net-worth individuals.

3.     On information and belief, Defendant SuRo is a Maryland corporation with its principal place of business in New York, New York.  SuRo used to do business under the name GSV Capital Corp., and was formerly headquartered in Woodside, California and San Francisco, California.  SuRo is a publicly-traded investment fund.  SuRo invests principally in the equity securities of venture-capital-backed emerging companies.  Plaintiff's cause of action against SuRo arises out of SuRo's actions in terminating its contract with GSVAM, a California-domiciled entity, to the knowing detriment of a contract between Plaintiff and GSVAM.

4.     On information and belief, Defendant Mark Klein is a resident of Scarsdale, County of Westchester, New York.  Klein is the Chief Executive Officer of Defendant SuRo, and formerly served as a consultant to Defendant GSVAM, which has its principal place of business in Woodside, California.

5.     On information and belief, Defendant Michael Moe is a resident of Dallas, County of Dallas, Texas.  Moe is the Chief Executive Officer of Defendant GSVAM, and formerly served as Chief Executive Officer of Defendant SuRo.  Moe co-founded GSVAM, which has its principal place of business in Woodside, California.

6.     Plaintiff does not know the true names and capacities of defendants sued in this Complaint as Doe 1 through Doe 99, inclusive, and therefore sues these defendants by fictitious names under Section 474 of the California Code of Civil Procedure.  Plaintiff will amend this Complaint to allege the true names and capacities of Doe 1 through Doe 99, inclusive, when ascertained.  Plaintiff is informed and believes, and on that basis alleges, that each of the defendants named herein as Doe 1 through Doe 99, inclusive, is responsible in some manner for the occurrence, injury, and other damages alleged in this Complaint.

CASE NO. _____                                                                                              COMPLAINT

**JURISDICTION AND VENUE**

7.    Jurisdiction is proper in the Superior Court for the County of San Mateo because it has general subject matter jurisdiction and no statutory exceptions to jurisdiction exist.

8.    This Court has personal jurisdiction over GSVAM because GSVAM's principal place of business and headquarters are in California and GSVAM is therefore domiciled in California.

9.    This Court has personal jurisdiction over SuRo because Suro has an office in San Francisco, California, and, on information and belief, SuRo has a wholly-owned subsidiary formed to originate loan investments within California named GCL, which does business regularly in California.

10.    This Court has personal jurisdiction over Klein because Klein purposefully established contacts with California by negotiating the Repurchase Agreement on behalf of the California company GSVAM, and this action arises out of and is related to Klein's involvement in the Repurchase Agreement negotiations, including tortious conduct interfering with the Repurchase Agreement.

11.    This Court has personal jurisdiction over Moe because is the CEO of the California company GSVAM, and this action arises out of and is related to Moe's conduct as CEO in executing and breaching the Repurchase Agreement.

12.    Venue is proper in the Superior Court for the County of San Mateo pursuant to California Code of Civil Procedure sections 395.2 and 395.5 because GSVAM's principal place of business is in San Mateo County.

**FACTUAL ALLEGATIONS**

**Background**

13.    In 2009, Bard co-founded GSVAM with Moe.  Broadly speaking, GSVAM was an investment management company that earned revenue by investing its clients' money strategically. Bard and Moe were Members (*i.e.*, owners) and Managers (*i.e.*, empowered to control and run-day-to-day operations of the Company), with Bard serving as Chief Operating Officer of GSVAM.

14.    In or around April 2011 and until on or about March 2019, GSVAM's largest revenue source was fees generated from the management of a publicly traded investment fund, SuRo.  Such

- 3 -

revenue was generated and received under the terms of an Investment Advisory Agreement between GSVAM and SuRo.[1]

15.     During this period, Moe served as Chief Executive Offer (CEO) of SuRo, and Bard served as Chief Financial Officer (CFO) and Chief Compliance Officer (CCO) of SuRo.

16.     Beginning a few months after GSVAM was founded, Bard and Moe had a dispute about company finances that persisted for years.  Bard and Moe were unable to resolve their disagreements.  Bard was ultimately removed from the SuRo CFO role in or around April 2014.  In July 2014, Moe terminated Bard as COO of GSVAM.

17.     Despite supposedly lacking an operational role at GSVAM after his termination, Bard retained his ownership interest.  Under the terms of GSVAM's LLC Agreement, that hindered Moe from unilaterally controlling GSVAM because Moe's interest was not large enough to meet the threshold for several critical decision-making powers.  The ensuing dispute between Bard and GSVAM led to litigation, which ultimately resulted in execution of the Repurchase Agreement to resolve the dispute.

**The Repurchase Agreement**

18.     At a high level, the Repurchase Agreement provides that Bard agrees to sell his ownership interest in GSVAM back to GSVAM in exchange for $5 million, with payment to be split between a $1.5 million up-front payment and the remaining $3.5 million to be paid in monthly installments of $29,166.66. §§ 1-3.[2]  Four additional provisions of the Repurchase Agreement are particularly relevant here.

19.     First, Section 3.1 includes subsections that provide for raising or lowering the monthly recurring payment amount based on GSVAM's trailing twelve-month revenues.  § 3.1(a) (lower payments, (b) (higher payments).  If GSVAM seeks to invoke the provision to lower the monthly payment amount, it must "as concurrently as practicable with the delivery of such payment . . . use commercially reasonable efforts to provide [Bard] with its, its independent auditor's, or a third-party

---

[1] At the time GSVAM was founded, SuRo did business under the name GSV Capital Corp.  In 2019, GSV Capital Corp. changed its name to Sutter Rock Capital Corp.  In 2020, the company changed its name again to SuRo Capital Corp.  For ease of reference, this Complaint refers to that company regardless of its name at the time of the events described as SuRo.

[2] References to "§ _" or "§§ _" are references to sections of the Repurchase Agreement.

CASE NO. _____                                                         COMPLAINT

administrator's, verification of Aggregate [trailing twelve month] Revenues for the month in question."
§ 3.1(e).

20.     Second, the Repurchase Agreement includes a frustration of purpose provision.  Section 10.4 provides that "[t]he Company shall not, and shall not permit any GSVAM Party to, in any way materially circumvent any provision of this Repurchase Agreement for the purpose of frustrating the Seller's reasonable expectations to receive the Purchase Price or the benefit of any other material provisions herein . . . ."

21.     Critically, Section 10.4 provides illustrative—but not exhaustive—examples of conduct that would constitute frustration of purpose.  As explained below, one such example describes a scenario where GSVAM personnel provide similar services to SuRo *after* GSVAM purportedly ceases providing such services:

> [I]f the Company ceases providing services to [SuRo] and, at any time within two years from the
> date on which the Company ceases providing such substantially similar investment advisory
> services to [SuRo], any GSVAM Party provides substantially similar investment advisory
> services to [SuRo], the Company, on its own behalf and on behalf of each other GSVAM Party,
> agrees that the seller shall be entitled to receive the Recurring Payment Amount from such
> GSVAM Party, on terms substantially similar to the terms of this Repurchase Agreement.

22.     Section 10.4 also provides that "the Company shall not re-constitute or create a new entity to perform substantially similar investment advisory services to [SuRo]."

23.     Third, prevailing parties in a suit to enforce the Repurchase Agreement are entitled to attorneys' fees.  § 13 ("If any legal action or other legal proceeding relating to this Repurchase Agreement or the enforcement of any provision of the Repurchase Agreement is brought against a party to this Repurchase Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs, and disbursements (in addition to any other relief to which the prevailing party may be entitled).").

24.     Fourth, the Repurchase Agreement states that GSVAM understood that Bard was relying on information contained in a "data room" that had been set-up to provide Bard access to GSVAM financial information and relevant representations to enable Bard to accurately value his ownership

- 5 -

interests during the settlement negotiations. Specifically, Section 7.10 states that GSVAM "acknowledges that the Seller determined the Upfront Payment Amount and the Recurring Payment Amount based on the information supplied by the Company in the Merrill Corporation 'DataSite Project Pegasus Dataroom 2017' that the Seller was invited to access beginning on May 8, 2017 (the 'Data Room'), including but not limited to, management presentations, due diligence discussions, estimates, projections or forecasts involving the Company and the Identified Entities. The Company acknowledges and represents that the information in the Data Room was true and accurate as of the date posted to the Data Room."

25.    Bard and Moe (on behalf of GSVAM) executed the Repurchase Agreement. The Repurchase Agreement is dated September 18, 2017. Thereafter, GSVAM made the $1.5 million up-front payment, Bard transferred his ownership interest back to GSVAM, and GSVAM made, and as alleged below recently ceased, monthly payments required under the contract to Bard.

**SuRo's Knowledge of the Repurchase Agreement and Klein's Misrepresentations**

26.    SuRo was aware of the existence and terms of the Repurchase Agreement at the time it was executed. Mark Klein, who was acting as a consultant to GSVAM and as CEO of SuRo when the Repurchase Agreement was executed, was personally and extensively involved in the negotiation of the terms of the Repurchase Agreement.

27.    Klein initiated the settlement negotiations with Bard that led to the Repurchase Agreement. Indeed, Klein first suggested the basic framework for the deal that was ultimately struck, and Klein was the sole individual negotiating terms directly with Bard on behalf of GSVAM and Moe that led to an agreement in principle between GSVAM, Moe, and Bard.

28.    During negotiations between Bard and GSVAM and Moe, all of which involved and included Klein, including numerous text messages, phone calls, and in-person meetings in California between Klein and Bard from about April 2017 to September 2017, Bard expressed a concern that Moe had been spending extensive time and resources on other projects besides GSVAM while he was supposed to be focused on GSVAM. Bard explained to Klein that it was therefore important to Bard that revenue Moe received from those other projects and entities were considered GSVAM revenue for purposes of considering revenue available to GSVAM to make monthly payments to Bard.

29.     Klein agreed with Bard that revenue Moe received from the other entities and projects should count as GSVAM revenue for purposes of the Repurchase Agreement's monthly payments. Those entities were ultimately listed on Annex A of the Repurchase Agreement.  Bard asked that GSVAM and Moe, who negotiated using Klein, agree that Moe transfer any ownership interest and entitlement to revenue from those entities over to GSVAM from Moe's personal capacity.

30.     Klein promised Bard that Moe's interests in revenue from the Annex A entities were already in the process of being transferred and that process would be completed.  But, GSVAM and Moe (speaking through Klein) asked Bard to finalize the Repurchase Agreement before the transfer process was complete to avoid delays.

31.     Klein, Moe, and GSVAM's promise that Moe's interests in revenue from the Annex A entities would be transferred was also documented the data room.  For example, the data room contained a document that stated "Today, Moe owns 50% of the ASU GSV Summit. . . . Moe intends to transfer his ownership stake to GSV Asset Management."  The document also stated that Moe was the "sole party" to a contract to publish the Global Silicon Valley handbook, and that Moe "intends to transfer this contract to GSV Asset Management."  Additionally, the document stated that GSVAM was "negotiating an economic stake in the [GSV] Acceleration Fund."

32.     On information and belief, Moe's personal interests in Annex A entities were never transferred to GSVAM despite GSVAM and Moe's promise, offered via Klein.  GSVAM and Moe never intended to perform the promise when it was made it, which Klein knew when he reported that promise to Bard.  For example, the ASU GSV Summit, which is an entity referenced in Annex A under the name GSV Summit LLC, held an event in 2021 that should have generated millions of dollars in revenue.  Yet, GSVAM represented to Bard that trailing-twelve-month revenues from all entities on Annex A (*i.e.*, including the ASU GSV Summit) were at zero since October 2021.

33.     On information and belief, Moe continues to receive some revenue from one or more entities listed on Annex A.  Despite Moe and GSVAM's promise, GSVAM is not counting that revenue as revenue that counts towards GSVAM revenue under Section 3.1(a) of the Repurchase Agreement.

34.     After execution of the Repurchase Agreement, Klein had several conversations with Bard during which Klein inquired about the status of Bard's relationship with GSVAM.  During those

- 7 -

1  conversations, Bard referenced GSVAM's ongoing monthly payment obligations, further confirming

2  that Klein (and therefore SuRo) were well-aware of the Repurchase Agreement's monthly payment

3  terms.

4  **SuRo Hires GSVAM Personnel In-House and Terminates its GSVAM Contract**

5  35.    In March 2019, SuRo announced (via SEC Form 8-K and quarterly earnings call) that it

6  was terminating its contract with GSVAM.  SuRo explained during the earnings call that instead of

7  using GSVAM as an outside vendor, SuRo was internalizing the functions formerly served by GSVAM,

8  purportedly to save SuRo money and thereby "create tangible near-term, and long-term value for [SuRo]

9  shareholders."

10  36.    SuRo accomplished that by hiring GSVAM personnel to perform the same tasks that

11  GSVAM had been doing for SuRo.  Those personnel included Allison Green, formerly SVP of Finance

12  and Controller at GSVAM, who became CFO at SuRo.  SuRo also hired into senior roles others who had

13  serviced GSV Capital while affiliated with GSVAM, including Jackson Stone.  Indeed, by that time Moe

14  had been replaced as CEO of SuRo by Mark Klein, who was also previously affiliated with GSVAM as

15  a highly-paid consultant and who did extensive work for and on behalf of GSVAM for years.

16  37.    Klein, Green, Stone, and others – all formerly employed by or affiliated with GSVAM –

17  assumed significant roles at SuRo and were handsomely compensated in their new roles at SuRo.  For

18  example, during the Q4 2018 earnings conference where SuRo announced the termination of the

19  GSVAM contract, the three SuRo employees participating in the investor call on behalf of SuRo were

20  Klein, Green, and Stone.  Klein and Green are Named Executive Officers for purposes of public

21  securities filings.  Those filings show that Klein's total compensation exceeded $4 million dollars each

22  year in 2019 and 2020—and exceeded $7.5 million in 2021.   Green's total compensation likewise

23  exceeded $1.2 million each year in 2019 and 2020, and eclipsed $1.6 million in 2021.

24  38.    SuRo also announced that it was entering into a $1.25 million consulting agreement with

25  Moe in his individual capacity to purportedly assist with transition-related services.  And, SuRo stated

26  during the earnings call that a $4.7 million fee owed to GSVAM under the contract between SuRo and

27  GSVAM was being eliminated by mutual agreement between GSVAM and SuRo.

28

CASE NO. _____                                                          COMPLAINT

39.     Bard sent a letter to GSVAM and SuRo in April 2019, which noted his concerns about the potential impact of the SuRo contract termination on GSVAM's ability to honor its payment obligations under the Repurchase Agreement.  GSVAM responded by letter in April 2019 that GSVAM "plans to continue making the monthly payments pursuant to the Agreement."  SuRo responded in May 2019 by letter, stating that SuRo's actions were undertaken "in the best interest of [SuRo] and its shareholders."

40.     Despite later arguing to Bard that money Moe receives directly from Annex A entities is not relevant revenue for purposes of the Repurchase Agreement's recurring payment reduction clause -- because supposedly only money paid to GSVAM directly counts as GSVAM revenue -- GSVAM took the opposite position in its accounting of revenue from Moe's consulting agreement with SuRo. Specifically, GSVAM ultimately treated the $1.25 consulting fee paid to Moe as GSVAM revenue for purposes of its internal audited financial statements.

41.     Notwithstanding SuRo's stated goal of saving money and creating "long-term value for [SuRo] shareholders," and despite the growing executive compensation of Klein, Green, and others at SuRo since the March 2019 decision to end the GSVAM contract, SuRo's share price has declined significantly.  For example, on March 14, 2019, the date SuRo announced the termination of its contract with GSVAM, SuRo's stock closed at $6.68 per share.  By December 2022, the stock had declined about 45%, closing at $3.70 per share on December 28.

**GSVAM Breaches the Repurchase Agreement in September 2022**

42.     On September 7, 2022, current CFO and CCO of GSVAM William Vastardis emailed Bard out of the blue.  Vastardis stated that that GSVAM had been "overpaying you each month for the past two years" under the Repurchase Agreement.  Vastardis attached an Excel spreadsheet purporting to show that the relevant trailing twelve-month revenues had fallen to *zero* in October 2021—and every month thereafter.  Vastardis provided no supporting documentation.

43.     After Bard replied by email requesting clarification, including requesting details about money Moe received directly from Annex A entities, Vastardis emailed another Excel spreadsheet purporting to summarize GSVAM's annual revenues.

- 9 -

44.     That spreadsheet distinguished between "Bard Revenue" and "Non-Bard Revenue," apparently reflecting GSVAM's view that not all of GSVAM's revenue counted as revenue for purposes of monthly payments GSVAM owes Bard under the Repurchase Agreement.  The summary spreadsheet claimed that GSVAM's "Bard Revenue" in 2021 was zero, while its "Non-Bard Revenue" was high enough not to trigger any application of the Repurchase Agreement's temporary payment reduction provision.  Like the first spreadsheet, the second one included no supporting documentation.  As of the date of this filing, GSVAM has never provided any documentation to Bard to support its summary Excel files despite Bard's written protests about the unsupported, self-serving summary spreadsheets.

45.     GSVAM stopped making its monthly payments to Bard in September 2022.  Prior to stopping payment, no one at GSVAM ever told Bard it intended to stop making those payments.

46.     GSVAM paid Bard zero each month of September, October, November, and December 2022.  As a result, GSVAM still owes Bard $1,808,332.92 (62 months x $29,166.66) of the Purchase Price it agreed to pay in the Repurchase Agreement.

47.     GSVAM's trailing twelve-month revenues in September, October, November, and December 2022 were greater than zero.

48.     On information and belief, trailing twelve-month revenues Moe received in September, October, November, and December 2022 from entities listed in Annex A of the Repurchase Agreement in September were greater than zero.

49.     On information and belief, trailing twelve-month revenues that former senior GSVAM personnel received in September, October, November, and December 2022 from SuRo to perform the same services GSVAM formerly performed for SuRo were greater than zero.

50.     The Repurchase Agreement also provides, in relevant part of Section 3.1(e), that GSVAM will provide Bard a copy of GSVAM's audited financial statements for the previous calendar year that "[n]o later than March 31 of each calendar year."  GSVAM still has not provided Bard a copy of its 2021 audited financial statements, despite requests from Bard.

CASE NO. _____                                                    COMPLAINT

1

2

**First Cause of Action: Breach of Written Contract**

**(against GSVAM)**

3       51.     Bard repeats and incorporates each of the prior allegations in this Complaint, as set forth

4   above.

5       52.     GSVAM entered into a binding written contract (the Repurchase Agreement) with Bard

6   in which GSVAM agreed to pay Bard a total of $5 million, including by monthly payments spread out

7   over ten years, in exchange for Bard's ownership interest in GSVAM.  Bard and Moe (on behalf of

8   GSVAM) signed the contract.

9       53.     Bard performed his obligations under the Repurchase Agreement, including by

10  transferring his ownership interest in GSVAM back to GSVAM.

11      54.     All conditions required for GSVAM's performance occurred or were excused.

12      55.     GSVAM breached the Repurchase Agreement by failing to pay the required monthly

13  payments in September, October, November, and December 2022.  GSVAM paid Bard zero in those

14  months.   GSVAM also repudiated future monthly payments by announcing an accounting methodology

15  it was applying to the Repurchase Agreement's temporary monthly payment reduction provision that

16  would lead to no reasonable likelihood of future monthly payments ever being made.

17      56.     GSVAM also breached the Repurchase Agreement by failing to provide Bard 2021

18  audited financials in a timely manner.

19      57.     GSVAM further breached the Repurchase Agreement by failing to provide appropriate

20  verification of its self-serving representations about GSVAM's trailing twelve-month revenues, instead

21  relying on summary Excel spreadsheets with no supporting documentation or third-party verification.

22      58.     Bard has incurred damages as a result of GSVAM's beaches of the Repurchase

23  Agreement in an amount to be proven at trial.

24      **Second Cause of Action: (Breach of Implied Covenant of Good Faith and Fair Dealing)**

25      **(against GSVAM)**

26      59.   Bard repeats and incorporates each of the prior allegations in this Complaint set forth above.

27      60.   Bard alleges, in the alternative to his breach of contract claim, that GSVAM breached the

28  implied covenant of good faith and fair dealing.  GSVAM entered into a binding written contract (the

- 11 -

Repurchase Agreement) with Bard in which GSVAM agreed to pay Bard a total of $5 million, including by monthly payments spread out over ten years, in exchange for Bard's ownership interest in GSVAM. Bard and Moe (on behalf of GSVAM) signed the contract.

61.   Bard performed his obligations under the Repurchase Agreement, including by transferring his ownership interest in GSVAM back to GSVAM.

62.   All conditions required for GSVAM's performance occurred or were excused.

63.   The Repurchase Agreement does not expressly address a scenario where SuRo terminates its contract with GSVAM and GSVAM employees leave GSVAM to work at SuRo to provide the same services that GSVAM provided, and whether revenues paid to former GSVAM employees working at SuRo count as revenues for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

64.   The Repurchase Agreement does not expressly address whether revenues GSVAM receives from entities not listed in Annex A count as revenues for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

65.   The Repurchase Agreement does not expressly address whether revenues Moe receives from entities listed in Annex A count towards count as revenues for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

66.   GSVAM prevented Bard from receiving the benefits under the Repurchase Agreement by, in September 2022, abruptly changing its internal accounting interpretation of revenues that count toward monthly payments owed Bard under the Repurchase Agreement, and paying Bard zero for the monthly payments in September, October, November, and December 2022.

67.   GSVAM prevented Bard from receiving the benefits under the Repurchase Agreement by, from September 2022 forward, excluding revenues SuRo paid to former GSVAM employees and consultants working at SuRo for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

68.   GSVAM prevented Bard from receiving the benefits under the Repurchase Agreement by, from September 2022 forward, excluding revenues GSVAM receives from sources other than the entities listed in Annex A for purposes of the Repurchase Agreement's temporary monthly payment

reduction provision (Section 3.1(a)).

69. GSVAM prevented Bard from receiving the benefits under the Repurchase Agreement by, from September 2022 forward, excluding revenues Moe receives from the entities listed in Annex A for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)), despite Moe's representations via Klein and in the data room that such revenues would flow to GSVAM during negotiations of the Repurchase Agreement.

70. GSVAM did not act fairly and in good faith.

71. Bard was harmed by GSVAM's conduct by (i) not receiving full monthly payments he is owed under the Repurchase agreement in September, October, November, and December 2022, and instead receiving no payments at all; and (ii); and paying attorneys' fees prior to litigation and through litigation.

72. As a result of GSVAM's breaches, Plaintiff has been damaged in an amount to be proven at trial, plus interest, attorneys' fees, and costs.

**Third Cause of Action: Reformation**

**(against GSVAM)**

73. Bard repeats and incorporates each of the prior allegations in this Complaint set forth above.

74. Bard alleges, in the alternative to his breach of contract and breach of implied covenant of good faith and fair dealing claims, that Bard is entitled to reformation of the Repurchase Agreement.

75. On or about May 31, 2017, Bard and Klein (acting as an agent of GSVAM) reached an oral agreement on the essential terms of an agreement for Bard to sell his ownership interest in GSVAM back to GSVAM in exchange for money.

76. On June 22, 2017, the oral agreement was reduced to writing by GSVAM.

77. The written contract (*i.e.*, the Repurchase Agreement) was fully executed on September 18, 2017.

78. In September 2022, Bard discovered that the written contract does not truly express the parties' agreements on certain and essential material terms.

79.    Specifically, the written contract does not contain essential and material terms that the parties agreed to.

80.    The essential and material terms that were not included in the written contract are contained in Section 3.1 of the contract, which provides a formula for temporarily reducing monthly payments owed to Bard when Aggregate TTM Revenues "received by the Company from the entities identified on Annex A hereto" drop below a certain threshold.  The parties' actual agreement was that Aggregate TTM Revenues would *include* revenues "received by the Company from the entities identified on Annex A hereto" – not be limited to such revenues.

81.    On November 4, 2022, Bard communicated to GSVAM (specifically, CFO William Vastardis) that the written contract does not truly express the parties' agreement, and requested that the written contract be applied to truly express the parties' agreement as set out in Paragraph 80.

82.    GSVAM refuses to correct the written contract.

83.    The omission of the aforementioned terms was the result of a unilateral mistake by Bard that GSVAM knew or suspected at the time the parties entered into the written contract.

84.    GSVAM knew that Bard understood Aggregate TTM Revenues not to be limited to money GSVAM received from entities listed in Annex A because Bard's stated purpose of including a list of entities in Annex A was to capture *additional* revenues that Moe and GSVAM received due to Moe's work on side-projects during his tenure at GSVAM instead of focusing on GSVAM business.

85.    As a result of the aforementioned mistake, the written contract must be revised under California Civil Code Section 3399 so that it accurately expresses the parties' mutual intention at the time Bard and GSVAM entered into the contract, as set out in Paragraph 80.

86.    Bard is entitled to monetary relief incidental to reformation of the written contract to adjust the equities between Bard and GSVAM. Specifically, Bard has failed to receive the full monthly payments he is owed under the contract in September, October, November, and December 2022.

**Fourth Cause of Action: Fraud**

**(against Klein, Moe, GSVAM and SuRo)**

87.    Bard repeats and incorporates each of the prior allegations in this Complaint, as set forth above.

- 14 -

88.     Klein, Moe, GSVAM, and SuRo, represented that Moe and GSVAM intended to transfer Moe's interests in receiving money from the entities listed in Annex A of the Repurchase Agreement from Moe personally to GSVAM shortly after the execution of the Repurchase Agreement. Specifically, Klein, who was both (a) a GSVAM consultant and acting as an authorized agent of GSVAM and representing GSVAM in negotiations with Bard, and concurrently (b) CEO of SuRo and acting with apparent and actual authority as a representative of SuRo, stated orally to Bard during negotiation of the Repurchase Agreement in or about August 2017 during a telephone conversation that the transfers were in process and would be completed shortly after execution of the Repurchase Agreement.  In addition, Klein, Moe, and GSVAM expressly represented in a document in the data room that Moe's interests in the ASU GSV Summit and the Grand Central Publishing contract would be assigned to GSVAM, and that GSVAM would shortly thereafter acquire a significant interest in the GSV Acceleration Fund.

89.     This promise was material because GSVAM's monthly payment obligations depended on revenues available to GSVAM, and the promise was made to assuage Bard's stated concern that Moe could conceal money available to make the monthly payments by receiving it directly from the entities in Annex A instead of the money being paid to GSVAM.

90.     Bard is informed and believes and on that basis alleges that Klein, Moe, GSVAM, and SuRo had no intention of honoring this false promise when Klein, Moe, and GSVAM made it because transfer of Moe's interests is a straightforward task that was never even attempted despite no obstacles to its completion and the assurance it was in process and would be completed promptly.

91.     Bard is informed and believes and on that basis alleges that Klein, Moe, GSVAM, and SuRo deliberately made the false promise regarding transfer of Moe's interests to induce Bard to enter into the Repurchase Agreement.

92.      Bard relied to his detriment on Klein, Moe, GSVAM, and SuRo's false promise by entering into the Repurchase Agreement. Bard would have behaved differently if Bard had known the promise was false in that Bard would have delayed execution of the Repurchase Agreement until the transfers were complete or not signed the Repurchase Agreement at all.

93.      Bard's reliance on Klein, Moe, GSVAM, and SuRo's false promise was justified in that Bard had no reason to doubt the truthfulness of the promise about the transfer of Moe's interests because

- 15 -

Klein was the lead negotiator on behalf of GSVAM who had a close personal relationship with Moe at that time, and the promise was memorialized in a document in the data room that the Repurchase Agreement expressly acknowledged Bard was relying on in entering into the contract.

94.     Klein, Moe, GSVAM, and SuRo's false promise, inducing Bard's reliance thereon, was the direct and proximate cause of Bard's loss, which Bard would not have sustained but for Klein, Moe, GSVAM, and SuRo's fraud.

95.      Bard sustained out-of-pocket losses and benefit-of-the-bargain losses of at least the additional amount(s) GSVAM owed Bard in monthly payments had money Moe received directly from entities in Annex A instead been treated as GSVAM revenue for purposes of calculating the monthly payments under the Repurchase Agreement due to Klein, Moe, GSVAM, and SuRo's false promise.

96.     As a result of Klein, Moe, GSVAM, and SuRo's fraud, Bard is entitled to an award of damages in an amount to be proved at trial.

97.     Additionally, Bard is entitled to punitive damages as a result of Klein, Moe, GSVAM, and SuRo's fraudulent conduct. The conduct constituting fraud was committed by one or more officers, directors, or managing agents of SuRo (i.e., Klein).  In addition, the conduct constituting fraud was authorized by one or more officers, directors, or managing agents of GSVAM (i.e., Moe), and one or more officers, directors, or managing agents of GSVAM (i.e,, Moe) knew of the conduct constituting fraud and adopted and approved that conduct after it occurred.

**Fifth Cause of Action: Aiding and Abetting Fraud**

**(against Klein, Moe, GSVAM, and SuRo)**

98.     Bard repeats and incorporates each of the prior allegations in this Complaint, as set forth above.

99.     Moe, Klein, GSVAM, and SuRo knew that Moe, Klein, GSVAM, and SuRo were going to commit fraud as alleged in Paragraphs 87-97.

100.    Moe, Klein, GSVAM, and SuRo gave substantial assistance and encouragement to Moe, Klein, GSVAM, and SuRo, including by Moe including the false representations in the data room and by Moe telling Klein he would transfer the interests despite not intending to do so.

CASE NO. _____                                                  COMPLAINT

101.    Moe, Klein, GSVAM, and SuRo's conduct was a substantial factor in causing harm to Bard, because Moe, Klein, GSVAM, and SuRo would not have made the false promise without Moe, Klein, GSVAM, and SuRo's encouragement and authorization.

102.    Further, Moe, Klein, GSVAM, and SuRo conspired together to commit the fraud.  Moe, Klein, GSVAM, and SuRo were aware that Moe, Klein, GSVAM, and SuRo intended to make the false promise, and Moe, Klein, GSVAM, and SuRo agreed with Moe, Klein, GSVAM, and SuRo and intended that the fraud be committed.

103.    As a result of Moe's aiding and abetting fraud, Bard is entitled to an award of damages in an amount to be proved at trial.

104.    Additionally, Bard is entitled to punitive damages as a result of Moe, Klein, GSVAM, and SuRo aiding and abetting the fraud.

**Sixth Cause of Action: Intentional Interference with Contractual Relations**

**(against SuRo and Klein)**

105.    Bard repeats and incorporates each of the prior allegations in this Complaint, as set forth above.

106.    On or about September 18, 2017, Bard and GSVAM entered into a contract: the Repurchase Agreement.  The purpose of the agreement was to settle a dispute between Bard and GSVAM by Bard selling his ownership interest in GSVAM back to GSVAM in exchange for an up-front payment and monthly recurring payments thereafter until the full purchase price was satisfied.

107.    At all relevant times, the Repurchase Agreement was valid and enforceable.  The contract was signed, Bard transferred his ownership back to GSVAM pursuant to the contract, and GSVAM began making payments to Bard required by the Repurchase Agreement.

108.    SuRo had knowledge of the Repurchase Agreement between Bard and GSVAM.  Mark Klein, who was acting as a consultant to GSVAM and CEO of SuRo when the Repurchase Agreement was executed, was personally and extensively involved in the negotiation of the terms of the Repurchase Agreement.  Klein initiated the settlement negotiations with Bard that led to the Repurchase Agreement.  Indeed, Klein first suggested the basic framework for the deal that was ultimately struck, and Klein was the sole individual negotiating terms directly with Bard that led to an agreement in principle.  In

- 17 -

1  addition, after execution of the Repurchase Agreement, Klein had several conversations with Bard

2  during which Klein inquired about the status of Bard's relationship with GSVAM.  During those

3  conversations, Bard referenced GSVAM's ongoing monthly payment obligations.

4      109.    In September, October, November, and December 2022, GSVAM breached the

5  Repurchase Agreement by failing to pay Bard the full monthly payment amounts owed under the

6  Repurchase Agreement and instead paying Bard nothing at all.

7      110.    Klein and SuRo intentionally disrupted the contractual relationship by terminating its

8  Investment Advisory Agreement with GSVAM and hiring GSVAM personnel to perform the same

9  services previously provided by GSVAM in-house at SuRo. Klein and SuRo knew that interference with

10 the contractual relationship between Bard and GSVAM was certain or substantially certain to occur as a

11 result of Klein and SuRo's wrongful conduct because Klein and SuRo knew that SuRo was GSVAM's

12 largest client and termination of the contract would drastically reduce GSVAM's revenues, making it

13 more difficult for GSVAM to honor its payment obligations to Bard under the Repurchase Agreement.

14     111.    Klein and SuRo's interference was a substantial factor in causing Bard to suffer

15 economic harm in that Bard has failed to receive any monthly payments since September 2022.

16     112.    Klein and SuRo's interference was a substantial factor in causing Bard to suffer

17 emotional distress and incur consequential damages for the reduced monthly payments Bard has

18 received since September 2022.

19     113.    Additionally, Plaintiff is entitled to punitive damages as a result of Klein and SuRo's

20 conduct. Specifically, Klein and SuRo acted with malice and oppression in terminating its GSVAM

21 contract and raiding GSVAM's personnel while knowing that its conduct would cause Bard harm under

22 the Repurchase Agreement.

23                          **PRAYER FOR RELIEF**

24     Wherefore, Plaintiffs pray that the Court award judgment against GSVAM and SuRo as follows:

25     1.    For an award of economic damages in an amount to be determined at trial;

26     2.    For punitive damages in an amount to be determined according to proof;

27     3.    For an award of emotional distress damages in an amount to be determined at trial;

28

- 18 -

4.    For an order reforming the written contract entered into between Bard and GSVAM in the following manner to reflect the true intention of the parties: providing that Section 3.1's payment reduction should be calculated by looking to GSVAM's revenues "including" the entities identified on Annex A;

5.    For an award providing recovery of attorneys' fees and costs of suit incurred in connection with this action;

6.    For an award of prejudgment interest

7.    For an award of post-judgment interest for the maximum amount allowed by law

8.    For an award of costs; and

9.    For such further and just relief as this Court deems proper.

## JURY DEMAND

Bard demands a jury trial of all causes of action asserted herein so triable.


Respectfully submitted,

DATED: December 29, 2022                 DELAHUNTY & EDELMAN LLP


*/s/ William J. Edelman*
WILLIAM J. EDELMAN
Attorneys for Plaintiffs