PATRICK R. DELAHUNTY (CA Bar No. 257439)
pdelahunty@delawllp.com
WILLIAM J. EDELMAN (CA Bar No. 285177)
wedelman@delawllp.com
DELAHUNTY & EDELMAN LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel:    (415) 891-6210
Fax:    (415) 891-6256

*Attorneys for Plaintiff Stephen D. Bard*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STEPHEN D. BARD,<br><br>      Plaintiff,<br><br>v.<br><br>GSV ASSET MANAGEMENT, LLC a Delaware limited liability company; MICHAEL T. MOE, an individual; THOMAS C. FRANCO, an individual; FELIPE HELD, an individual; HMF PARTNERS LLC, a Delaware limited liability company; and DOES 1 TO 99,<br><br>      Defendants. | CASE NO. 4:23-CV-00488-WHO<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES:**<br><br>(1) Breach of Written Contract<br>(2) Breach of Implied Covenant of Good Faith and Fair Dealing<br>(3) Reformation<br>(4) Fraud<br>(5) Aiding and Abetting Fraud<br>(6) Intentional Interference with Contractual Relations<br><br>**DEMAND FOR JURY TRIAL**<br><br>**(REDACTED)** |

This action arises from the termination of a business partnership. Plaintiff Stephen D. Bard ("Bard" or "Plaintiff") co-founded Defendant GSV Asset Management, LLC ("GSVAM" or the "Company") along with another individual, Defendant Michael T. Moe ("Moe"). Since its founding, GSVAM's biggest client and largest source of revenue was SuRo Capital Corp. ("SuRo"), formerly known as GSV Capital Corp. Bard and Moe also co-founded GSV Capital Corp. In 2014, after a dispute between Bard and Moe, Moe ultimately pushed Bard out of an operational role at GSVAM. This led to further disputes, which Bard and GSVAM ultimately settled by executing a written Repurchase Agreement dated September 18, 2017 (the "Repurchase Agreement"). Mark D. Klein ("Klein"), acting as a consultant to and agent of GSVAM and Moe, negotiated the Repurchase Agreement on behalf of GSVAM.

Under the Repurchase agreement, Bard agreed to sell his interest in GSVAM back to GSVAM. In exchange, GSVAM agreed to pay Bard $5 million. Payment of that purchase price was split between a $1.5 million up-front payment and monthly recurring payments thereafter until the $3.5 million balance of the purchase price was satisfied.

During negotiation of that agreement, GSVAM and Moe insisted that the contract permit GSVAM to lower its monthly payment obligations if GSVAM revenues dropped below a certain threshold. To convince Bard to agree to this payment structure, Moe and GSVAM promised Bard that Moe would complete a process already (according to Moe and GSVAM) in motion of transferring certain business interests Moe personally owned to GSVAM so that GSVAM's revenue sources would be enhanced. This promise was important to Bard because (i) Moe had used Bard's and GSVAM's financial and human resources to create and launch those business entities, some of which are thriving today (e.g., GSV Ventures and GSV Summit), and (ii) it made it less likely that GSVAM revenues would drop below the threshold triggering a lower monthly payment. Bard relied on that promise, ensured that it was expressly incorporated into the contract by way of reference to representations contained in a "data room" set up as part of the negotiation of the Repurchase Agreement, and executed the contract.

Unbeknownst to Bard, however, Moe and GSVAM never intended for Moe to transfer his personal interests to GSVAM as promised to Bard. Rather, at the same time Moe and GSVAM were



negotiating with Bard, they were also negotiating with a third party, HMF Partners LLC ("HMF") and its owners Thomas Franco and Felipe Held, to provide an additional investment in GSVAM.

HMF knew the purpose of its investment was to satisfy GSVAM's payment obligations to Bard,

Moe and GSVAM dangled the transfer of Moe's interests in both sets of negotiations (i.e., with both Bard and the HMF team) simultaneously. Instead of transferring Moe's interests to GSVAM as promised to Bard, however, Moe and GSVAM used those interests to successfully attract the HMF investment.

Beginning in September 2022 and thereafter, GSVAM failed to honor its payment commitments by unilaterally ceasing all monthly payments. GSVAM still owes Bard over $1.8 million. GSVAM purportedly is unable to make payments in part because of revenue losses and cash shortfalls,

In doing so, HMF, Franco, and Held intentionally interfered with the Repurchase Agreement.

By this Complaint, Plaintiff seeks redress for GSVAM's failure to honor its obligations to make the monthly payments it agreed to in exchange for Bard's interest in the Company; Moe and GSVAM's fraud resulting in losses to Bard well as HMF, Franco, and Held's aiding and abetting that fraud; and HMF, Franco, and Held's intentional interference with contract.

## PARTIES

1.     Plaintiff is a resident of Incline Village, County of Washoe, Nevada.  Plaintiff is an investment and financial professional with experience serving in senior roles at companies and investment funds and firms, including Chief Operating Officer, Chief Financial Officer, and Chief Compliance Officer.

2.     On information and belief, Defendant GSVAM is a Delaware limited liability company with its principal place of business in Woodside, California.  GSVAM is an investment management firm servicing accredited institutions and high-net-worth individuals.

3.     On information and belief, Defendant Michael Moe is a resident of Dallas County, Texas. Moe is the Chief Executive Officer of Defendant GSVAM, and formerly served as Chief Executive Officer of SuRo.  Moe co-founded GSVAM, which has its principal place of business in Woodside, California.

4.     On information and belief, Defendant Thomas C. Franco ("Franco") is a resident of New York.  Franco is a co-owner of HMF, in addition to being a partner at the private equity investment firm Clayton Dubilier & Rice LLC, which has managed billions of dollars in assets.

5.     On information and belief, Defendant Felipe Held ("Held") is not a citizen of Nevada. Held is a co-owner of HMF, in addition to being the CEO and co-founder of HMC Capital, a global investment firm with over ten billion dollars in assets under management.

6.     On information and belief, Defendant HMF is a Delaware limited liability company with its principal place of business in New York.  On information and belief, HMF is an entity formed by Franco and Held for the purpose of investing in GSVAM.

7.     Plaintiff does not know the true names and capacities of defendants sued in this Complaint as Doe 1 through Doe 99, inclusive, and therefore sues these defendants by fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of Doe 1 through Doe 99,

- 3 -

inclusive, when ascertained. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants named herein as Doe 1 through Doe 99, inclusive, is responsible in some manner for the occurrence, injury, and other damages alleged in this Complaint.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between the plaintiff, a citizen of Nevada, and defendants, citizens of California and Texas (and none citizens of Nevada), and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9. This Court has personal jurisdiction over GSVAM because GSVAM's principal place of business and headquarters are in California and GSVAM is therefore domiciled in California.

10. This Court has personal jurisdiction over Moe because Moe is the CEO of the California company GSVAM, and this action arises out of and is related to Moe's conduct as CEO in executing and breaching the Repurchase Agreement as well as defrauding Bard in connection with the agreement.

11. This Court has personal jurisdiction over HMF because HMF purposefully availed itself of the privilege of doing business in California by engaging in extensive negotiations and entering into investment agreements with a California citizen company (GSVAM) and then-California citizen (Moe), knowing that the investment would be used to satisfy payment obligations of a contract the California citizen company had with Bard (which was governed by a California choice-of-law provision), and then aiding and abetting Moe and GSVAM's fraud related to that California contract and intentionally tortiously interfering with the contract between GSVAM and Bard by terminating HMF's investment contracts with GSVAM and Moe. This action arises out of those investment contracts, that fraud, and that tortious interference. The Court also has personal jurisdiction because the acts of HMF's agents Franco and Held are imputed to HMF.

12. This Court has personal jurisdiction over Franco because Franco negotiated and entered into investment agreements with a California citizen company (GSVAM) and then-California citizen (Moe), knowing that the investment would be used to satisfy payment obligations of a contract the California citizen company GSVAM had with Bard (which was governed by a California choice-of-law provision), and then aiding and abetting Moe and GSVAM's fraud related to that California contract and

- 4 -

intentionally tortiously interfering with the contract between GSVAM and Bard by terminating HMF's investment contracts with GSVAM and Moe.   This action arises out of those investment contracts, that fraud, and that tortious interference.

13.     This Court has personal jurisdiction over Held because Held negotiated and entered into investment agreements with a California citizen company (GSVAM) and then-California citizen (Moe), knowing that the investment would be used to satisfy payment obligations of a contract the California citizen company GSVAM had with Bard (which was governed by a California choice-of-law provision), and then aiding and abetting Moe and GSVAM's fraud related to that California contract and intentionally tortiously interfering with the contract between GSVAM and Bard by terminating HMF's investment contracts with GSVAM and Moe.   This action arises out of those investment contracts, that fraud, and that tortious interference.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) (2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.  Venue is also proper because this Court is part of the "district and division" within which the action was filed, San Mateo Superior Court, before a then-defendant removed the case under 28 U.S.C. §§ 1332, 1441, and 1446.

## DIVISIONAL ASSIGNMENT

15.     Assignment to this Division is appropriate under Civil L.R. 3-2(c) because the action arises out of San Mateo County and was removed from San Mateo County Superior Court.

## FACTUAL ALLEGATIONS

### Background

16.     In 2009, Bard co-founded GSVAM with Moe.  Broadly speaking, GSVAM was an investment management company that earned revenue by investing its clients' money strategically. Bard and Moe were Members (*i.e.*, owners) and Managers (*i.e.*, empowered to control and run-day-to-day operations of the Company), with Bard serving as Chief Operating Officer of GSVAM.

17.     In or around April 2011 and until on or about March 2019, GSVAM's largest revenue source was fees generated from the management of a publicly traded investment fund, SuRo.  Such

revenue was generated and received under the terms of an Investment Advisory Agreement between GSVAM and SuRo.[1]

18. During this period, Moe served as Chief Executive Offer (CEO) of SuRo, and Bard served as Chief Financial Officer (CFO) and Chief Compliance Officer (CCO) of SuRo.

19. Beginning a few months after GSVAM was founded, Bard and Moe had a dispute about company finances that persisted for years. Bard and Moe were unable to resolve their disagreements. Bard was ultimately removed from the SuRo CFO role in or around April 2014. In July 2014, Moe terminated Bard as COO of GSVAM.

20. Despite supposedly lacking an operational role at GSVAM after his termination, Bard retained his ownership interest. Under the terms of GSVAM's LLC Agreement, that hindered Moe from unilaterally controlling GSVAM because Moe's interest was not large enough to meet the threshold for several critical decision-making powers. The ensuing dispute between Bard and GSVAM led to litigation, which ultimately resulted in execution of the Repurchase Agreement to resolve the dispute.

### The Repurchase Agreement

21. At a high level, the Repurchase Agreement provides that Bard agrees to sell his ownership interest in GSVAM back to GSVAM in exchange for $5 million, with payment to be split between a $1.5 million up-front payment and the remaining $3.5 million to be paid in monthly installments of $29,166.66. §§ 1-3.[2] Four additional provisions of the Repurchase Agreement are particularly relevant here.

22. First, Section 3.1 includes subsections that provide for raising or lowering the monthly recurring payment amount based on GSVAM's trailing twelve-month revenues. § 3.1(a) (lower payments, (b) (higher payments). If GSVAM seeks to invoke the provision to lower the monthly payment amount, it must "as concurrently as practicable with the delivery of such payment . . . use commercially reasonable efforts to provide [Bard] with its, its independent auditor's, or a third-party

---

[1] At the time GSVAM was founded, SuRo did business under the name GSV Capital Corp. In 2019, GSV Capital Corp. changed its name to Sutter Rock Capital Corp. In 2020, the company changed its name again to SuRo Capital Corp. For ease of reference, this Complaint refers to that company regardless of its name at the time of the events described as SuRo.

[2] References to "§ _" or "§§ _" are references to sections of the Repurchase Agreement.

- 6 -

administrator's, verification of Aggregate [trailing twelve month] Revenues for the month in question." § 3.1(e).

23.     Second, the Repurchase Agreement includes a frustration of purpose provision.  Section 10.4 provides that "[t]he Company shall not, and shall not permit any GSVAM Party to, in any way materially circumvent any provision of this Repurchase Agreement for the purpose of frustrating the Seller's reasonable expectations to receive the Purchase Price or the benefit of any other material provisions herein . . . ."

24.     Critically, Section 10.4 provides illustrative—but not exhaustive—examples of conduct that would constitute frustration of purpose.  As explained below, one such example describes a scenario where GSVAM personnel provide similar services to SuRo *after* GSVAM purportedly ceases providing such services:

> [I]f the Company ceases providing services to [SuRo] and, at any time within two years from the date on which the Company ceases providing such substantially similar investment advisory services to [SuRo], any GSVAM Party provides substantially similar investment advisory services to [SuRo], the Company, on its own behalf and on behalf of each other GSVAM Party, agrees that the seller shall be entitled to receive the Recurring Payment Amount from such GSVAM Party, on terms substantially similar to the terms of this Repurchase Agreement.

25.     Section 10.4 also provides that "the Company shall not re-constitute or create a new entity to perform substantially similar investment advisory services to [SuRo]."

26.     Third, prevailing parties in a suit to enforce the Repurchase Agreement are entitled to attorneys' fees.  § 13 ("If any legal action or other legal proceeding relating to this Repurchase Agreement or the enforcement of any provision of the Repurchase Agreement is brought against a party to this Repurchase Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees, costs, and disbursements (in addition to any other relief to which the prevailing party may be entitled).").

27.     Fourth, the Repurchase Agreement states that GSVAM understood that Bard was relying on information contained in a "data room" that had been set-up to provide Bard access to GSVAM

financial information and relevant representations to enable Bard to accurately value his ownership interests during the settlement negotiations.  Specifically, Section 7.10 states that GSVAM "acknowledges that the Seller determined the Upfront Payment Amount and the Recurring Payment Amount based on the information supplied by the Company in the Merrill Corporation 'DataSite Project Pegasus Dataroom 2017' that the Seller was invited to access beginning on May 8, 2017 (the 'Data Room'), including but not limited to, management presentations, due diligence discussions, estimates, projections or forecasts involving the Company and the Identified Entities."  Section 7.10 went on to further promise the accuracy and reliability of that information, providing:"The Company acknowledges and represents that the information in the Data Room was true and accurate as of the date posted to the Data Room."

28. Moe personally reviewed and approved of these representations in the Data Room. ███
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████

29. Bard and Moe (on behalf of GSVAM) executed the Repurchase Agreement.  The Repurchase Agreement is dated September 18, 2017.  Thereafter, GSVAM made the $1.5 million up-front payment, Bard transferred his ownership interest back to GSVAM, and GSVAM made, and as alleged below recently ceased, monthly payments required under the contract to Bard.

**Moe's Fraudulent Promise to Transfer Personal Interests to GSVAM**

30. During negotiations of the Repurchase Agreement between Bard and GSVAM and Moe, all of which involved and included Klein acting as a consultant to GSVAM and CEO of SuRo, Bard expressed a concern that Moe had been spending extensive GSVAM time, financial, and human resources to launch those other entities while he was supposed to be focused on GSVAM.  These negotiations included numerous text messages, phone calls, and in-person meetings in California between Klein and Bard from about April 2017 to September 2017, Bard explained to Klein that it was therefore important to Bard that revenue Moe received from those other projects and entities were considered GSVAM revenue for purposes of considering revenue available to GSVAM to make monthly payments to Bard.

31.     Moe and GSVAM, via Klein, agreed with Bard that revenue Moe received from the other entities and projects should count as GSVAM revenue for purposes of the Repurchase Agreement's monthly payments.  Those entities were ultimately listed on Annex A of the Repurchase Agreement. Bard asked that GSVAM and Moe, who negotiated using Klein as their agent, agree that Moe transfer any ownership interest and entitlement to revenue from those entities over to GSVAM from Moe's personal capacity.[3]

32.     Klein verbally promised Bard that Moe's interests in revenue from the Annex A entities were already in the process of being transferred and that process would be completed.  But, GSVAM and Moe (speaking through Klein) asked Bard to finalize the Repurchase Agreement before the transfer process was complete to avoid delays.

33.     At Bard's insistence, Moe and GSVAM's promise that Moe's interests in revenue from the Annex A entities would be transferred was also documented the data room.  For example, the data room contained a document that stated "Today, Moe owns 50% of the ASU GSV Summit. . . . Moe intends to transfer his ownership stake to GSV Asset Management."  The document also stated that Moe was the "sole party" to a contract to publish the Global Silicon Valley handbook, and that Moe "intends to transfer this contract to GSV Asset Management."  Additionally, the document stated that GSVAM was "negotiating an economic stake in the [GSV] Acceleration Fund."

34.     On information and belief, Moe's personal interests in Annex A entities were never transferred to GSVAM despite GSVAM and Moe's promise, offered via their agent Klein.  For example, the ASU GSV Summit, which is an entity referenced in Annex A under the name GSV Summit LLC, held an event in 2021 that should have generated millions of dollars in revenue.  Yet, GSVAM represented to Bard that trailing-twelve-month revenues from all entities on Annex A (*i.e.*, including the ASU GSV Summit) were at zero since October 2021.  Additional evidence that the interests were not

_____

[3] That Klein was acting as an agent of Moe and GSVAM is underscored by GSVAM's privilege redactions in the documents it produced per the Court's Minute Order (ECF No. 42) following the hearing on the then-Defendants' motion to dismiss the previous complaint.  Specifically, GSVAM made numerous redactions to emails discussing negotiation of the Repurchase Agreement in which Klein was a party to emails with counsel for GSVAM, confirming that GSVAM is itself treating Klein as an authorized agent.  Notably, many of those redactions are highly questionable, including redactions where no lawyer is copied, which redactions Bard should have an opportunity to challenge in discovery.

transferred to GSVAM include ████████████████████████████

███████████████████████████████████

███████████████████

35.     Unbeknownst to Bard at the time – and not discovered by Bard until June 2023 when this Court ordered GSVAM and Moe to produce certain documents in connection with GSVAM and Moe's initial disclosures in this case – Moe and GSVAM never intended for Moe to transfer his personal interests to GSVAM. This was because Moe was simultaneously negotiating with another entity regarding transfer of those interests. Specifically, at the same time Moe and GSVAM were negotiating the Repurchase Agreement with Bard, they were also negotiating with HMF Partners LLC ("HMF") and its owners Thomas Franco and Felipe Held, to provide a cash infusion to GSVAM. Specifically, Moe and GSVAM were seeking an investment by HMF that would enable GSVAM to meet the looming payment obligations to Bard that GSVAM anticipated under the Repurchase Agreement. ████████

████████████████████████████████████

36.     Franco, Held, and HMF knew that at least one purpose of its investment was to enable GSVAM to satisfy GSVAM's payment obligations to Bard. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

37.     Moe and GSVAM ultimately reached a deal with HMF ████████████
and executed written agreements memorializing the deal. ████████████████

████████████████████████████████████

██████████████████████████



38.

39.     Moe essentially was double-dealing.  For example, despite Moe and GSVAM having promised Bard that Moe would transfer his personal interests in Annex A entities to GSVAM to boost GSVAM's revenues, Moe used those interests to attract the HMF investment.

40.     Specifically,

41.

- 11 -



42.     Moe concealed this from Bard.

43.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████ Thus, despite money still
apparently flowing to Moe from the interests he promised Bard he would transfer to GSVAM, GSVAM
is not considering that money to be GSVAM revenue under Section 3.1(a) of the Repurchase Agreement
that counts towards revenues available to satisfy GSVAM's payment obligations to Bard.

**GSVAM Loses its SuRo Contract**

44. In March 2019, SuRo announced (via SEC Form 8-K and quarterly earnings call) that it
was terminating its contract with GSVAM. SuRo explained during the earnings call that instead of
using GSVAM as an outside vendor, SuRo was internalizing the functions formerly served by GSVAM,
purportedly to save SuRo money and thereby "create tangible near-term, and long-term value for [SuRo]
shareholders."

45. SuRo accomplished that by hiring GSVAM personnel to perform the same tasks that
GSVAM had been doing for SuRo. Those personnel included Allison Green, formerly SVP of Finance
and Controller at GSVAM, who became CFO at SuRo. SuRo also hired into senior roles others who had
serviced GSV Capital while affiliated with GSVAM, including Jackson Stone. Indeed, by that time Moe
had been replaced as CEO of SuRo by Mark Klein, who was also previously affiliated with GSVAM as
a highly-paid consultant and who did extensive work for and on behalf of GSVAM for years.

46. Klein, Green, Stone, and others – all formerly employed by or affiliated with GSVAM –
assumed significant roles at SuRo and were handsomely compensated in their new roles at SuRo. For
example, during the Q4 2018 earnings conference where SuRo announced the termination of the
GSVAM contract, the three SuRo employees participating in the investor call on behalf of SuRo were
Klein, Green, and Stone. Klein and Green are Named Executive Officers for purposes of public
securities filings. Those filings show that Klein's total compensation exceeded $4 million dollars each

---

[5] Deborah Quazzo co-owned GSV Summit with Moe. GSV Summit is an entity listed on Annex A. Moe transferred to Legend LLC his interest in GSV Summit in the Assignment.

year in 2019 and 2020—and exceeded $7.5 million in 2021.  Green's total compensation likewise exceeded $1.2 million each year in 2019 and 2020, and eclipsed $1.6 million in 2021.

47.  SuRo also announced that it was entering into a $1.25 million consulting agreement with Moe in his individual capacity to purportedly assist with transition-related services.  And, SuRo stated during the earnings call that a $4.7 million fee owed to GSVAM under the contract between SuRo and GSVAM was being eliminated by mutual agreement between GSVAM and SuRo.

48.  Bard sent a letter to GSVAM and SuRo in April 2019, which noted his concerns about the potential impact of the SuRo contract termination on GSVAM's ability to honor its payment obligations under the Repurchase Agreement.  GSVAM responded by letter in April 2019 that GSVAM "plans to continue making the monthly payments pursuant to the Agreement."

49.  Later on in this dispute as litigation neared, GSVAM argued to Bard that money Moe receives directly from Annex A entities is not relevant revenue for purposes of the Repurchase Agreement's recurring payment reduction clause, because supposedly only money paid to GSVAM directly counts as GSVAM revenue.  But GSVAM, and its independent certified public accounting and audit firm, Spicer Jeffries, took the opposite position in its accounting of revenue from Moe's consulting agreement with SuRo.  Specifically, GSVAM ultimately treated the $1.25 consulting fee paid to Moe personally as GSVAM revenue for purposes of its internal audited financial statements.  This is an important accounting opinion that accurately reflects the intent of all parties – and which Moe and GSVAM agreed to.

50.  Moreover, Moe himself understood that money he was personally receiving from Annex A entities should be treated as GSVAM revenue.



[Text redacted — lines 1-9 blacked out]

## **GSVAM Breaches the Repurchase Agreement in September 2022**

57.     On September 7, 2022, current CFO and CCO of GSVAM William Vastardis emailed Bard out of the blue. Vastardis stated that that GSVAM had been "overpaying you each month for the past two years" under the Repurchase Agreement. Vastardis attached an Excel spreadsheet purporting to show that the relevant trailing twelve-month revenues had fallen to *zero* in October 2021—and every month thereafter. Vastardis provided no supporting documentation.

58.     After Bard replied by email requesting clarification, including requesting details about money Moe received directly from Annex A entities, Vastardis emailed another Excel spreadsheet purporting to summarize GSVAM's annual revenues.

59.     That spreadsheet distinguished between "Bard Revenue" and "Non-Bard Revenue, apparently reflecting GSVAM's view that not all of GSVAM's revenue counted as revenue for purposes of monthly payments GSVAM owes Bard under the Repurchase Agreement. The summary spreadsheet claimed that GSVAM's "Bard Revenue" in 2021 was zero, while its "Non-Bard Revenue" was high enough not to trigger any application of the Repurchase Agreement's temporary payment reduction provision. Like the first spreadsheet, the second one included no supporting documentation. As of the date of this filing, GSVAM has never provided any documentation to Bard to support its summary Excel files despite Bard's written protests about the unsupported, self-serving summary spreadsheets.

60.     GSVAM stopped making its monthly payments to Bard in September 2022. Prior to stopping payment, no one at GSVAM ever told Bard it intended to stop making those payments.

- 16 -

61. GSVAM paid Bard zero each month from September 2022 to present. As a result, GSVAM still owes Bard $1,808,332.92 (62 months x $29,166.66) of the Purchase Price it agreed to pay in the Repurchase Agreement.

62. GSVAM's trailing twelve-month revenues in from September 2022 to present were greater than zero.

63. On information and belief, trailing twelve-month revenues Moe received from September 2022 to present from entities listed in Annex A of the Repurchase Agreement in September were greater than zero.

64. On information and belief, trailing twelve-month revenues that former senior GSVAM personnel received from September 2022 to present from SuRo to perform the same services GSVAM formerly performed for SuRo were greater than zero.

65. The Repurchase Agreement also provides, in relevant part of Section 3.1(e), that GSVAM will provide Bard a copy of GSVAM's audited financial statements for the previous calendar year that "[n]o later than March 31 of each calendar year." GSVAM still has not provided Bard a copy of its 2021 and 2022 audited financial statements, despite requests from Bard.

**Bard Neither Knew Nor Should Have Known About the Fraud until September 2022**

66. Bard was unaware that Moe's promise to transfer his personal interests to GSVAM was false when it was made nor that the statement the transfer was in progress was false. Bard did not know about the GSVAM-HMF transaction designed to help fund GSVAM's payment obligations to Bard, in part because Moe took affirmative steps to conceal it from Bard as described above ██████████ ████████████████████████████████ Thus, Bard had no knowledge of the details of the HMF-GSVAM deal, ████████████████████████████████ ████████████

67. Bard did not have reason to suspect that Moe did not transfer his interests to GSVAM as promised until September 7, 2022, when GSVAM abruptly reduced his payments to zero and claimed by an email from GSVAM CFO Vastardis that relevant trailing-twelve-month revenues had dropped to zero since October 2021. Until that point, Bard had been receiving full payments anticipated by the Repurchase Agreement, neither Moe nor anyone at GSVAM had made any representations to Bard that

lack of revenues were supposedly impacting GSVAM's ability to meet its payment obligations, and Bard therefore had no reason to suspect that Moe had failed to ensure that revenues from Annex A entities were going somewhere besides GSVAM.

68. The GSVAM financial information provided to Bard by GSVAM did not enable Bard to discover earlier that Moe had failed to transfer his interests to GSVAM for two reasons. The only financial information Bard received from GSVAM after execution of the Repurchase Agreement was annual audited financial statements (always delivered months after the deadline and for the last two years not delivered at all), which do not itemize revenues in a way that would enable Bard to identify whether Moe's interests had been transferred.

69. GSVAM knows this, because Vastardis conceded it in an email to Bard. Specifically, in response to Vastardis's September 7, 2022 email to Bard first announcing the cessation of monthly payments, Bard requested that Vastardis supply GSVAM's latest audited financial statements and information about money Moe and GSVAM were receiving from Annex A entities to determine the accuracy of Vastardis's claim Bard had been "overpaid." Vastardis's email reply stated that GSVAM was still working on the audit, and added "[i]n any case, as you know from previous audits that [sic] clients are not listed out in detail as it relates to revenue. Not sure how the audit will assist you in that effort."

### First Cause of Action: Breach of Written Contract

### (against GSVAM)

70. Bard repeats and incorporates each of the prior allegations in this Complaint, as set forth above.

71. GSVAM entered into a binding written contract (the Repurchase Agreement) with Bard in which GSVAM agreed to pay Bard a total of $5 million, including by monthly payments spread out over ten years, in exchange for Bard's ownership interest in GSVAM. Bard and Moe (on behalf of GSVAM) signed the contract.

72. Bard performed his obligations under the Repurchase Agreement, including by transferring his ownership interest in GSVAM back to GSVAM.

73. All conditions required for GSVAM's performance occurred or were excused.

- 18 -

74. GSVAM breached the Repurchase Agreement by failing to pay the required monthly payments in from September 2022 to present. GSVAM paid Bard zero in those months. GSVAM also repudiated future monthly payments by announcing an accounting methodology it was applying to the Repurchase Agreement's temporary monthly payment reduction provision that would lead to no reasonable likelihood of future monthly payments ever being made.

75. GSVAM also breached the Repurchase Agreement by failing to provide Bard 2021 and 2022 audited financials.

76. GSVAM further breached the Repurchase Agreement by failing to provide appropriate verification of its self-serving representations about GSVAM's trailing twelve-month revenues, instead relying on summary Excel spreadsheets with no supporting documentation or third-party verification.

77. GSVAM further breached the Repurchase Agreement by failing to transfer Moe's interests in Annex A entities from Moe to GSVAM, a promise found in Section 7.10 of the contract, which expressly incorporated the representations in the Data Room (including the representations about transferring Moe's interests).

78. Bard has incurred damages as a result of GSVAM's beaches of the Repurchase Agreement in an amount to be proven at trial.

### Second Cause of Action: (Breach of Implied Covenant of Good Faith and Fair Dealing)
### (against GSVAM)

79. Bard repeats and incorporates each of the prior allegations in this Complaint set forth above.

80. Bard alleges, in the alternative to his breach of contract claim, that GSVAM breached the implied covenant of good faith and fair dealing. GSVAM entered into a binding written contract (the Repurchase Agreement) with Bard in which GSVAM agreed to pay Bard a total of $5 million, including by monthly payments spread out over ten years, in exchange for Bard's ownership interest in GSVAM. Bard and Moe (on behalf of GSVAM) signed the contract.

81. Bard performed his obligations under the Repurchase Agreement, including by transferring his ownership interest in GSVAM back to GSVAM.

82. All conditions required for GSVAM's performance occurred or were excused.

83. The Repurchase Agreement does not expressly address a scenario where SuRo terminates its contract with GSVAM and GSVAM employees leave GSVAM to work at SuRo to provide the same services that GSVAM provided, and whether revenues paid to former GSVAM employees working at SuRo count as revenues for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

84. The Repurchase Agreement does not expressly address whether revenues GSVAM receives from entities not listed in Annex A count as revenues for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

85. The Repurchase Agreement does not expressly address whether revenues Moe receives from entities listed in Annex A count towards count as revenues for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

86. GSVAM prevented Bard from receiving the benefits under the Repurchase Agreement by, in September 2022, abruptly changing its internal accounting interpretation of revenues that count toward monthly payments owed Bard under the Repurchase Agreement, and paying Bard zero for the monthly payments from September 2022 to present.

87. GSVAM prevented Bard from receiving the benefits under the Repurchase Agreement by, from September 2022 forward, excluding revenues SuRo paid to former GSVAM employees and consultants working at SuRo for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

88. GSVAM prevented Bard from receiving the benefits under the Repurchase Agreement by, from September 2022 forward, excluding revenues GSVAM receives from sources other than the entities listed in Annex A for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)).

89. GSVAM prevented Bard from receiving the benefits under the Repurchase Agreement by, from September 2022 forward, excluding revenues Moe receives from the entities listed in Annex A for purposes of the Repurchase Agreement's temporary monthly payment reduction provision (Section 3.1(a)), ███████████████ ███ despite GSVAM's representations via Klein and in the data room that such revenues would flow

- 20 -

to GSVAM.

90. GSVAM did not act fairly and in good faith.

91. Bard was harmed by GSVAM's conduct by (i) not receiving full monthly payments he is owed under the Repurchase agreement from September 2022 to present, and instead receiving no payments at all; and (ii); and paying attorneys' fees prior to litigation and through litigation.

92. As a result of GSVAM's breaches, Plaintiff has been damaged in an amount to be proven at trial, plus interest, attorneys' fees, and costs.

## Third Cause of Action: Reformation

### (against GSVAM)

93. Bard repeats and incorporates each of the prior allegations in this Complaint set forth above.

94. Bard alleges, in the alternative to his breach of contract and breach of implied covenant of good faith and fair dealing claims, that Bard is entitled to reformation of the Repurchase Agreement.

95. On or about May 31, 2017, Bard and Klein (acting as an agent of GSVAM) reached an oral agreement on the essential terms of an agreement for Bard to sell his ownership interest in GSVAM back to GSVAM in exchange for money.

96. On June 22, 2017, the oral agreement was reduced to writing by GSVAM.

97. The written contract (*i.e.*, the Repurchase Agreement) was fully executed on September 18, 2017.

98. In September 2022, Bard discovered that the written contract does not truly express the parties' agreements on certain and essential material terms.

99. Specifically, the written contract does not contain essential and material terms that the parties agreed to.

100. The essential and material terms that were not included in the written contract are contained in Section 3.1 of the contract, which provides a formula for temporarily reducing monthly payments owed to Bard when Aggregate TTM Revenues "received by the Company from the entities identified on Annex A hereto" drop below a certain threshold. The parties' actual agreement was that

Aggregate TTM Revenues would *include* revenues "received by the Company from the entities identified on Annex A hereto" – not be limited to such revenues.

101.  On November 4, 2022, Bard communicated to GSVAM (specifically, CFO William Vastardis) that the written contract does not truly express the parties' agreement, and requested that the written contract be applied to truly express the parties' agreement as set out in Paragraph 80.

102.  GSVAM refuses to correct the written contract.

103.  The omission of the aforementioned terms was the result of a unilateral mistake by Bard that GSVAM knew or suspected at the time the parties entered into the written contract.

104.  GSVAM knew that Bard understood Aggregate TTM Revenues not to be limited to money GSVAM received from entities listed in Annex A because Bard's stated purpose of including a list of entities in Annex A was to capture *additional* revenues that Moe and GSVAM received due to Moe's work on side-projects during his tenure at GSVAM instead of focusing on GSVAM business.

105.  As a result of the aforementioned mistake, the written contract must be revised under California Civil Code Section 3399 so that it accurately expresses the parties' mutual intention at the time Bard and GSVAM entered into the contract, as set out in Paragraph 80.

106.  Bard is entitled to monetary relief incidental to reformation of the written contract to adjust the equities between Bard and GSVAM.   Specifically, Bard has failed to receive the full monthly payments he is owed under the contract since September 2022.

## Fourth Cause of Action: Fraud

### (against Moe and GSVAM)

107.  Bard repeats and incorporates each of the prior allegations in this Complaint, as set forth above.

- 22 -

108.    Moe and GSVAM represented that Moe and GSVAM intended to transfer Moe's interests in receiving money from the entities listed in Annex A of the Repurchase Agreement from Moe personally to GSVAM shortly after the execution of the Repurchase Agreement.  Specifically, Klein, acting as a GSVAM consultant and authorized agent of GSVAM and Moe in negotiations with Bard, stated orally to Bard during negotiation of the Repurchase Agreement in or about August 2017 during a telephone conversation that the transfers were in process and would be completed shortly after execution of the Repurchase Agreement.  In addition, Moe and GSVAM expressly represented in a document in the data room, which Moe personally reviewed and approved, that Moe's interests in the ASU GSV Summit and the Grand Central Publishing contract would be assigned to GSVAM, and that GSVAM was negotiating acquisition of a significant interest in the GSV Acceleration Fund.  Those Data Room representations were incorporated by reference into the Repurchase Agreement that Moe signed on behalf of GSVAM.

109.    This promise was material because GSVAM's monthly payment obligations depended on revenues available to GSVAM, and the promise was made to assuage Bard's stated concern that Moe could conceal money available to make the monthly payments by receiving it directly from the entities in Annex A instead of the money being paid to GSVAM.

110.    Bard is informed and believes and on that basis alleges that Moe and GSVAM had no intention of honoring this false promise when Moe and GSVAM made it, nor was the representation that the transfer was in process true, because transfer of Moe's interests is a straightforward task that was never even attempted despite no obstacles to its completion and the assurance it was in process and would be completed promptly.  Rather, Moe and GSVAM were simultaneously negotiating a funding deal with HMF ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

111. Bard is informed and believes and on that basis alleges that Moe and GSVAM deliberately made the false promise regarding transfer of Moe's interests to induce Bard to enter into the Repurchase Agreement.

112. Bard relied to his detriment on Moe and GSVAM's false promise by entering into the Repurchase Agreement. Bard would have behaved differently if Bard had known the promise was false in that Bard would have delayed execution of the Repurchase Agreement until the transfers were complete or, in the alternative, not signed the Repurchase Agreement at all.

113. Bard's reliance on Moe and GSVAM's false promise was justified in that Bard had no reason to doubt the truthfulness of the promise about the transfer of Moe's interests because Klein was the lead negotiator on behalf of GSVAM who had a close personal relationship with Moe at that time, the promise was memorialized in a document in the data room that the Repurchase Agreement expressly acknowledged Bard was relying on in entering into the contract, and Bard had no knowledge of Moe and GSVAM's parallel negotiations with HMF, Franco and Held, which Moe took affirmative steps to conceal from Bard.

114. Moe and GSVAM's false promise, inducing Bard's reliance thereon, was the direct and proximate cause of Bard's loss, which Bard would not have sustained but for Moe and GSVAM's fraud.

115. Bard sustained out-of-pocket losses and benefit-of-the-bargain losses of at least the additional amount(s) GSVAM owed Bard in monthly payments had money Moe received directly from entities in Annex A instead been treated as GSVAM revenue for purposes of calculating the monthly payments under the Repurchase Agreement due to Moe and GSVAM's false promise.

116. As a result of Moe and GSVAM's fraud, Bard is entitled to an award of damages in an amount to be proved at trial.

117. Additionally, Bard is entitled to punitive damages as a result of Moe and GSVAM's fraudulent conduct. The conduct constituting fraud was authorized by one or more officers, directors, or managing agents of GSVAM (i.e., Moe), and one or more officers, directors, or managing agents of GSVAM (i.e,, Moe) knew of the conduct constituting fraud and adopted and approved that conduct after it occurred.

## Fifth Cause of Action: Aiding and Abetting Fraud

### (against Moe, GSVAM, HMF, Franco, and Held)

118. Bard repeats and incorporates each of the prior allegations in this Complaint, as set forth above.

119. Moe, GSVAM, HMF, Franco, and Held knew that Moe and GSVAM were going to commit fraud as alleged in the previous Cause of Action, including by use Klein, an agent of Moe and GSVAM. Moe and GSVAM knew because they perpetrated the fraud and Moe was in direct communication with Klein. HMF, Franco, and Held knew because they were aware of the details of the Repurchase Agreement and its terms, including the Repurchase Agreement's incorporation of documents in the Data Room. On information and belief, HMF, Franco, and Held had access to the Data Room ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████

120. Moe, GSVAM, HMF, Franco, and Held gave substantial assistance and encouragement to Moe and GSVAM, including by Moe including and approving the false representations in the data room and by Moe telling Klein he would transfer the interests despite not intending to do so. █ ███████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████

121. Moe, GSVAM, HMF, Franco, and Held's conduct was a substantial factor in causing harm to Bard, because Moe and GSVAM (and their agent Klein) would not have made the false promise without Moe, GSVAM, HMF, Franco, and Held's encouragement and authorization.

122. As a result of Moe, GSVAM, HMF, Franco, and Held's aiding and abetting fraud, Bard is entitled to an award of damages in an amount to be proved at trial.

123. Additionally, Bard is entitled to punitive damages as a result of Moe, GSVAM, HMF, Franco, and Held aiding and abetting the fraud.

**Sixth Cause of Action: Intentional Interference with Contractual Relations**

**(against HMF, Franco, and Held)**

124. Bard repeats and incorporates each of the prior allegations in this Complaint, as set forth above.

125. On or about September 18, 2017, Bard and GSVAM entered into a contract: the Repurchase Agreement. The purpose of the agreement was to settle a dispute between Bard and GSVAM by Bard selling his ownership interest in GSVAM back to GSVAM in exchange for an up-front payment and monthly recurring payments thereafter until the full purchase price was satisfied.

126. At all relevant times, the Repurchase Agreement was valid and enforceable. The contract was signed, Bard transferred his ownership back to GSVAM pursuant to the contract, and GSVAM began making payments to Bard required by the Repurchase Agreement.

127. HMF, Franco, and Held had knowledge of the Repurchase Agreement between Bard and GSVAM.

128. Every month from September 2022 to present, GSVAM breached the Repurchase Agreement by failing to pay Bard the full monthly payment amounts owed under the Repurchase Agreement and instead paying Bard nothing at all.

129. HMF, Franco, and Held intentionally disrupted the contractual relationship by terminating HMF's investment contract with GSVAM when HMF because dissatisfied with GSVAM's performance in mid-2019. HMF, Franco, and Held knew that interference with the contractual relationship between Bard and GSVAM was certain or substantially certain to occur as a result of HMF, Franco, and Held's wrongful conduct because ███████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████

130. HMF, Franco, and Held's interference was a substantial factor in causing Bard to suffer economic harm in that Bard has failed to receive any monthly payments since September 2022.

131. HMF, Franco, and Held's interference was a substantial factor in causing Bard to suffer emotional distress and incur consequential damages for the reduced monthly payments Bard has received since September 2022.

132. Additionally, Plaintiff is entitled to punitive damages as a result of HMF, Franco, and Held's conduct. Specifically, HMF, Franco, and Held acted with malice and oppression in terminating HMF's contract with GSVAM while knowing that its conduct would cause Bard harm under the Repurchase Agreement by cutting off cash flow GSVAM was relying on to make its payments.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray that the Court award judgment against Moe and GSVAM as follows:

1.  For an award of economic damages in an amount to be determined at trial;

2.  For punitive damages in an amount to be determined according to proof;

3.  For an award of emotional distress damages in an amount to be determined at trial;

4.  For an order reforming the written contract entered into between Bard and GSVAM in the following manner to reflect the true intention of the parties: providing that Section 3.1's payment reduction should be calculated by looking to GSVAM's revenues "including" the entities identified on Annex A;

5.  For an award providing recovery of attorneys' fees and costs of suit incurred in connection with this action;

- 27 -

6. For an award of prejudgment interest

7. For an award of post-judgment interest for the maximum amount allowed by law

8. For an award of costs; and

9. For such further and just relief as this Court deems proper.

## **JURY DEMAND**

Bard demands a jury trial of all causes of action asserted herein so triable.


Respectfully submitted,

DATED: June 24, 2023                    DELAHUNTY & EDELMAN LLP


*/s/ William J. Edelman*
WILLIAM J. EDELMAN
Attorneys for Plaintiffs