1  DALE BISH, State Bar No. 235390
   ALLIE FELLOWS, State Bar No. 346701
2  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
3  650 Page Mill Road
   Palo Alto, CA 94304-1050
4  Telephone:  (650) 493-9300
   Facsimile:  (650) 565-5100
5  Email: dbish@wsgr.com
          afellows@wsgr.com
6
7  *Attorneys for Defendants*
   GSV Asset Management, LLC and
8  Michael T. Moe

9

UNITED STATES DISTRICT COURT

10

NORTHERN DISTRICT OF CALIFORNIA

11

SAN FRANCISCO DIVISION

12

| | |
|---|---|
| STEPHEN D. BARD, an individual, | CASE NO.: 3:23-cv-00488-WHO |
| Plaintiff, | **DEFENDANTS GSV ASSET** |
| v. | **MANAGEMENT, LLC AND** |
| | **MICHAEL T. MOE'S ANSWER** |
| GSV ASSET MANAGEMENT, LLC a Delaware | **AND COUNTERCLAIMS TO** |
| limited liability company; MICHAEL T. MOE, | **PLAINTIFF'S FIRST AMENDED** |
| an individual; THOMAS C. FRANCO, an | **COMPLAINT (ECF No. 48)** |
| individual; FELIPE HELD, an individual; HMF | |
| PARTNERS LLC, a Delaware limited liability | **DEMAND FOR JURY TRIAL** |
| company, and DOES 1 TO 99, | |
| Defendants. | |

# INTRODUCTORY STATEMENT

Stephen Bard's Complaint is premised on misleading, if not outright false allegations of fact. At its core, this dispute turns on whether the parties' September 18, 2017 Repurchase Agreement (ECF No. 54-2, "Repurchase Agreement" or "Agreement") required Michael Moe to transfer his personal interests in the Annex A entities to GSV Asset Management, LLC ("GSVAM" or the "Company"). In his Complaint, Bard represents that during the negotiations of the Repurchase Agreement, Moe and GSVAM promised and agreed that Moe would transfer his personal interests in certain enumerated entities to the Company, and that such term was crucial to the parties' deal. But in his Complaint, Plaintiff purposefully omits the extensive negotiations between both parties' counsel, which was documented by numerous drafts and discussions amongst counsel, that contradict the factual allegations in the Complaint.

In July 2017, Bard and his counsel explicitly requested that GSVAM and Moe agree to a provision requiring Moe to transfer his interests in certain enumerated entities to GSVAM. *See* Ex. A § 5.3. GSVAM's counsel explicitly rejected this request. Ex. B § 5.3. Similarly, Bard and his counsel requested GSVAM expand the applicable sources of revenue relevant for calculating any possible payment adjustments *multiple times*. *See* Ex. C § 3.1(a)-(b); Ex. D § 3.1(a)-(b). Those provisions were also rejected. *See* Ex. D § 3.1(a)-(b),[1] Ex. E § 3.1(a)-(b). Rather than reassert them, Bard's counsel agreed to the operative Repurchase Agreement at issue in this action without any of the provisions he now alleges were inadvertently or fraudulently omitted. *See generally* Ex. F.

Defendants therefore deny the allegations in Plaintiff's First Amended Complaint and, by way of its counterclaims, seek the return of monies it in fact overpaid Bard under the terms of the parties' Repurchase Agreement as well as their attorney's fees.

---

[1] Exhibit D shows that Bard's desired terms under Section 3.1(a) were struck by Bard's *own counsel*. *See* Ex. D § 3.1(a)-(b).

## ANSWER

Defendants GSV Asset Management, LLC ("GSVAM" or "Company") and Michael T. Moe ("Moe", collectively "Defendants"), by and through their undersigned counsel, hereby answer each of the numbered paragraphs of Plaintiff Stephen D. Bard's ("Plaintiff" or "Bard") First Amended Complaint (ECF No. 48, the "FAC"), and assert their affirmative defenses and counterclaims as set forth below. To the extent that the paragraphs of the FAC are grouped under headings and subheadings, Defendants respond generally that the headings and subheadings do not constitute factual averments, and thus the headings are not included herein. To the extent that a response is deemed necessary, Defendants deny each and every heading and sub-heading in the FAC. Except as explicitly admitted herein, Defendants deny any and all allegations set forth in the FAC, including without limitation, any allegations in the preamble, headings, subheadings, footnotes, and prayer for relief, and incorporate by reference this response in each paragraph below as if fully set forth therein. Defendants further answer the numbered paragraphs in the FAC as follows:

1.      Defendants admit Plaintiff has experience as an investment and financial professional and has served as a Chief Operating Officer, Chief Financial Officer, and Chief Compliance Officer. Defendants lack sufficient information to admit or deny the remaining allegations in paragraph 1 and on that basis deny them.

2.      Defendants admit GSVAM is a Delaware limited liability company and an investment management firm to accredited institutions and high-net-worth individuals. However, GSVAM's principal place of business is Dallas, Texas, and therefore, Defendants deny the remaining allegations of paragraph 2.

3.      Defendants admit that Moe is a resident of Dallas, Texas. Defendants admit that Moe co-founded GSVAM. Defendants deny the remaining allegations of paragraph 3 as GSVAM's principal place of business is Dallas, Texas.

4.      Defendants lack sufficient information to admit or deny the allegations in paragraph 4 and on that basis deny them.

Defs.' Answer and Counterclaims to Plaintiff's FAC
Case No.: 3:23-cv-00488-WHO

-2-

5.      Defendants lack sufficient information to admit or deny the allegations in paragraph 5 and on that basis deny them.

6.      Defendants lack sufficient information to admit or deny the allegations in paragraph 6 and on that basis deny them.

7.      Defendants lack sufficient information to admit or deny the allegations in paragraph 7 and on that basis deny them.

8.      Defendants admit this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Defendants deny this action involves citizens of California for the purposes of subject matter jurisdiction because none of GSVAM's members are citizens of California,[2] and though GSVAM's principal place of business is irrelevant for purposes of diversity, it is nevertheless not California.

9.      Defendants admit this Court has personal jurisdiction over GSVAM but deny that GSVAM is domiciled in California.

10.      Defendants admit this Court has personal jurisdiction over Moe. Defendants deny the remaining allegations in paragraph 10 of the FAC.

11.      Defendants lack sufficient information to admit or deny the allegations in paragraph 11 and on that basis deny them. Defendants specifically deny any allegations pertaining to any alleged fraud by Moe or GSVAM referenced in paragraph 11 of the FAC.

12.      Defendants lack sufficient information to admit or deny the allegations in paragraph 12 and on that basis deny them. Defendants specifically deny any allegations pertaining to any alleged fraud by Moe or GSVAM referenced in paragraph 12 of the FAC.

---

[2] The citizenship of an LLC depends on the citizenship of its members. *See Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). One of GSVAM's members is a foreign national and the other, Moe, is a citizen of Texas. Therefore, GSVAM is both a foreign citizen and citizen of Texas for purposes of diversity. *See id.* Because Plaintiff is a citizen of Nevada, the parties still satisfy the requirements of Section 1332, and Defendants admit this Court has subject matter jurisdiction.

13.     Defendants lack sufficient information to admit or deny the allegations in paragraph 13 and on that basis deny them. Defendants specifically deny any allegations pertaining to any alleged fraud by Moe or GSVAM referenced in paragraph 13 of the FAC.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Admitted.

20.     Defendants admit that following Bard's departure from GSVAM, Bard retained an ownership interest in the Company. Defendants admit that litigation ensued, and the Repurchase Agreement was ultimately executed in response to that litigation. Defendants deny the remaining allegations in paragraph 20 of the FAC.

21.     Defendants admit the Repurchase Agreement provides that Bard agrees to sell his ownership interest in GSVAM back to GSVAM in exchange for up to $5 million, paid in part by a $1.5 million up-front payment. Defendants deny the remaining allegations in paragraph 21 of the FAC.

22.     Defendants admit that Section 3.1 of the Repurchase Agreement authorizes GSVAM to raise or lower the monthly recurring payment amount. Defendants admit that the excerpted quote in paragraph 22 accurately reflects a select portion of the parties' Repurchase Agreement. Defendants deny the remaining allegations in paragraph 22 of the FAC.

23.     Defendants admit that the excerpted quote in paragraph 23 accurately reflects a portion of the parties' Repurchase Agreement. Defendants deny the remaining allegations in paragraph 23 of the FAC.

24.     Defendants admit that the excerpted quote in paragraph 24 accurately reflects a portion of the parties' Repurchase Agreement. Defendants deny the remaining allegations in paragraph 24 of the FAC.

25. Admitted.

26. Admitted.

27. Defendants admit that the excerpted quotes in paragraph 27 accurately reflect selected portions of the Repurchase Agreement. Defendants deny the remaining allegations in paragraph 27 of the FAC.

28. Defendants deny that the excerpted quote in paragraph 28 accurately reflects the May 13, 2017 email between Nicholas Franco, Mark Klein, and Moe (and others). Defendants further deny the allegations in paragraph 28 of the FAC.

29. Defendants admit that Bard and Moe (on behalf of GSVAM) executed the Repurchase Agreement, dated September 18, 2017. Defendants admit GSVAM made the $1.5 million up-front payment, that Bard transferred his ownership interest back to GSVAM, and that GSVAM made and recently stopped making monthly payments to Bard. Defendants deny such payments were contractually required given the language of Section 3.1(a) of the Repurchase Agreement. Defendants deny the remaining allegations in paragraph 29 of the FAC.

30. Defendants lack sufficient information to admit or deny the allegations in paragraph 30 regarding Mark Klein's statements to Bard and on that basis deny them. Defendants deny the remaining allegations in paragraph 30 of the FAC.

31. Defendants lack sufficient information to admit or deny the allegations in paragraph 31 regarding Mark Klein's statements to Bard and on that basis deny them. Defendants deny the remaining allegations in paragraph 31.

32. Defendants lack sufficient information to admit or deny the allegations in paragraph 32 regarding Mark Klein's statements to Bard and on that basis deny them. Defendants deny the remaining allegations in paragraph 32 of the FAC.

33. Defendants admit that the excerpted quotes in paragraph 33 accurately reflect select portions of a document placed in the data room during the negotiations of the Repurchase Agreement, except that the first quote should include "Michael" after "Today." Defendants deny the remaining allegations in paragraph 33 of the FAC.

34. Defendants admit that GSVAM communicated to Bard that the trailing twelve-month revenues from the Annex A entities have been zero since October 2021. Defendants deny the remaining allegations in paragraph 34 of the FAC.

35. Defendants admit that in 2017, GSVAM began negotiating with HMF Partners, LLC ("HMF"), Thomas C. Franco ("Franco"), and Felipe Held ("Held") regarding the possibility of an investment in GSVAM. Defendants admit that HMF's investment would be used in part to satisfy the future payment obligations to Bard under the Repurchase Agreement. Defendants deny the remaining allegations in paragraph 35 of the FAC.

36. Defendants admit that a portion of the HMF investment was meant to satisfy GSVAM's payment obligations to Bard under the Repurchase Agreement. Defendants admit that on July 17, 2017, Held emailed Moe (cc'ing Franco) and asked for a draft of the Repurchase Agreement. Defendants admit that on July 21, 2017, Held emailed Moe, Franco and others, providing comments to the draft Repurchase Agreement. Defendants admit that on September 28, 2017, Klein emailed the Board of Directors a copy of a draft term sheet between GSVAM and HMF Partners, LLC, except that Klein emailed the GSVC Board of Directors, not GSVAM Board of Directors. Defendants admit that the excerpted quote in paragraph 36 accurately reflects a portion of the draft term sheet. Defendants deny the remaining allegations in paragraph 36 of the FAC.

37. Admitted.

38. Defendants admit that the proceeds from HMF's investment were partially to be used to make payments on GSVAM's monthly obligation to Bard under the Repurchase Agreement. Defendants admit HMF received an ownership interest in GSVAM and that the terms of the deal purported to create a new GSVAM-HMF entity. Defendants deny the remaining allegations in paragraph 38 of the FAC.

39. Defendants deny the allegations in paragraph 39 of the FAC.

40. Defendants admit that on December 10, 2017, Klein forwarded a document titled "Assignment of Economic Interest Agreement," ("Assignment Agreement"). Defendants admit

Michael Moe executed the document on December 11, 2017. Defendants deny the remaining allegations in paragraph 40 of the FAC.

41. Defendants admit that the excerpted quote in paragraph 41 accurately reflects a portion of the Assignment Agreement, except that the word "the" should be placed before "conference." Defendants deny that Moe's interests were ultimately transferred and further deny the remaining allegations in paragraph 41 of the FAC.

42. Defendants admit that the excerpted quotes in paragraph 42 accurately reflect select portions of Moe's October 1, 2017 email to Debbie Elsen. Defendants admit that Moe requested Elsen wire Franco and Held's funds immediately to GSVAM and then to Bard as articulated in the Repurchase Agreement. Defendants deny the remaining allegations in paragraph 42 of the FAC.

43. Defendants admit that the excerpted quote in paragraph 43 accurately reflects a portion of the June 8, 2019 email from Franco to Moe and Held, among others. Defendants admit Franco attached a document to his email titled, "GSVAM Strategy Assessment." Defendants admit that the excerpted quote in paragraph 43 accurately reflects a portion of the "GSVAM Strategy Assessment Document." Defendants deny the remaining allegations of paragraph 43 of the FAC.

44. Defendants admit that SuRo Capital Corp. ("SuRo") announced its termination of GSVAM in a March 2019 SEC Form 8-K. Defendants admit that the excerpted quote in paragraph 44 accurately reflects a portion of the 8-K filed with the SEC. Defendants deny the remaining allegations of paragraph 44 of the FAC.

45. Defendants admit that after terminating GSVAM, SuRo hired GSVAM employees, including Allison Green and Jackson Stone. Defendants admit that Moe was also replaced as CEO of SuRo by Mark Klein. Defendants deny the remaining allegations of paragraph 45 of the FAC.

46. Defendants lack sufficient information to admit or deny the allegations in paragraph 46 and on that basis deny them.

47. Defendants admit that SuRo and Moe entered into a consulting agreement in Moe's individual capacity to assist with transition-related services. Defendants deny the remaining allegations in paragraph 47 of the FAC.

48.     Defendants admit that GSVAM sent a letter to Bard in April 2019. Defendants admit that the excerpted quote in paragraph 48 accurately reflects a portion of the letter, except that the beginning of the excerpted quote should read that "*GSVAM continues to plan* on making the required monthly payments pursuant to the Agreement." Defendants deny the remaining allegations in paragraph 48 of the FAC.

49.     Defendants admit that GSVAM treated a $1.25 consulting fee paid to Moe in his personal capacity as GSVAM revenue for purposes of its audited financial statements. Defendants admit that it is their position that the money Moe receives directly from the Annex A entities is not relevant for purposes of the Repurchase Agreement's recurring payment reduction clause, and that the only revenue relevant to that clause is the revenue GSVAM receives from the Annex A entities. Defendants deny the remaining allegations in paragraph 49 of the FAC.

50.     Defendants admit that the excerpted quote in paragraph 50 accurately reflects an email sent on June 8, 2019 from Moe to Franco, Held, and others. Defendants deny the remaining allegations in paragraph 50 of the FAC.

51.     Defendants admit that HMF and GSVAM ultimately terminated their relationship. Defendants admit that following that termination, GSVAM lost its cash source which in part allowed GSVAM to make its monthly payments to Bard. Defendants deny the remaining allegations of paragraph 51 of the FAC.

52.     Defendants admit that the excerpted quote in paragraph 52 accurately reflects an email sent on April 16, 2019 from Deborah Quazzo to Moe, except that "these people" should be "those people," and there is no "the" before "rest of his payments." Defendants deny the remaining allegations of paragraph 52 of the FAC.

53.     Defendants admit that the excerpted quote from the "GSVAM Strategy Assessment" attachment to Franco's June 8, 2019 email in paragraph 53 accurately reflects a portion of the document. Defendants admit that the excerpted quote of Moe's response accurately reflects a portion of his email. Defendants deny the remaining allegations in paragraph 53 of the FAC.

Defs.' Answer and Counterclaims to
Plaintiff's FAC
Case No.: 3:23-cv-00488-WHO

-8-

54. Defendants admit that the excerpted quote in paragraph 54 accurately reflects a portion of an attachment to a June 12, 2019 email from Held to Moe and Franco. Defendants deny the remaining allegations in paragraph 54 of the FAC.

55. Defendants admit that the excerpted quote in paragraph 55 accurately reflects portions of a May 22, 2021 email exchange between a potential investor and GSVAM's Chief Financial Officer ("CFO"). Defendants deny the remaining allegations in paragraph 55 of the FAC.

56. Defendants admit that GSVAM continued making monthly payments to Bard pursuant to the terms of the Repurchase Agreement until September 2022. Defendants deny the remaining allegations in paragraph 56 of the FAC.

57. Defendants admit that on September 7, 2022, GSVAM's CFO emailed Bard to inform him that GSVAM overpaid Bard for two years. Defendants admit the excerpted quote in paragraph 57 accurately reflects a portion of that email. Defendants admit that GSVAM's CFO included an excel spreadsheet showing that as of October 2021, the relevant twelve-month revenues were zero. Defendants deny the remaining allegations of paragraph 57 of the FAC.

58. Defendants admit that GSVAM personnel provided additional documentation summarizing GSVAM's annual revenues. Defendants deny the remaining allegations in paragraph 58 of the FAC.

59. Defendants admit that the spreadsheet referenced in paragraph 59 distinguishes between "Bard Revenue" and "Non-Bard Revenue." Defendants admit that its "Bard Revenue" in 2021 was zero, and its "Non-Bard Revenue," if applicable, would not trigger the payment reduction provision of the Repurchase Agreement. Defendants deny the remaining allegations in paragraph 59 of the FAC.

60. Admitted.

61. Defendants admit GSVAM ceased payments to Bard as of September 2022 and has not paid Bard since then. Defendants deny the remaining allegations of paragraph 61 of the FAC.

62. Defendants deny the allegations of paragraph 62 of the FAC.

63. Defendants deny the allegations of paragraph 63 of the FAC.

64. Defendants lack sufficient information to admit or deny the allegations in paragraph 64 and on that basis deny them.

65. Defendants admit that the excerpted quote in paragraph 65 is an accurate portion of the parties' Repurchase Agreement. Defendants admit they did not provide audited financial statements in 2021 or 2022, but Defendants deny that this is a breach of the terms of the Repurchase Agreement and likewise deny the remaining allegations of paragraph 65 of the FAC.

66. Defendants lack sufficient information to admit or deny the allegations regarding Bard's knowledge in paragraph 66 and on that basis deny them. Defendants deny the remaining allegations in paragraph 66 of the FAC.

67. Defendants admit that before September 7, 2022, GSVAM made uninterrupted monthly payments to Bard under the terms of the Repurchase Agreement. Defendants deny the remaining allegations in paragraph 67 of the FAC.

68. Defendants admit that GSVAM provided annual audited financial statements to Bard after the execution of the Repurchase Agreement. Defendants deny the remaining allegations of paragraph 68 of the FAC.

69. Defendants admit that the excerpted quote in paragraph 69 accurately reflects a portion of an email from GSVAM's CFO to Bard. Defendants deny the remaining allegations of paragraph 69 of the FAC.

70. Defendants incorporate by reference all preceding paragraphs as though fully set forth herein.

71. Defendants admit the Repurchase Agreement provides that Bard agrees to sell his ownership interest in GSVAM back to GSVAM in exchange for up to $5 million. Defendants admit Bard and Moe (who signed in his capacity as managing member of GSVAM) signed the Repurchase Agreement. Defendants deny the remaining allegations of paragraph 71 of the FAC.

72. Defendants admit Bard transferred his ownership interest in GSVAM back to GSVAM. Defendants deny the remaining allegations of paragraph 72 of the FAC.

73. Paragraph 73 calls for a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 73 of the FAC.

74. Defendants admit GSVAM stopped making payments to Bard in September 2022 and has not paid Bard since that date. Defendants deny the remaining allegations of paragraph 74 of the FAC.

75. Defendants deny the allegations of paragraph 75 of the FAC.

76. Defendants deny the allegations of paragraph 76 of the FAC.

77. Defendants deny the allegations of paragraph 77 of the FAC.

78. Defendants deny the allegations of paragraph 78 of the FAC.

79. Defendants incorporate by reference all preceding paragraphs as though fully set forth herein.

80. Defendants admit that GSVAM and Plaintiff entered into a binding written contract (the Repurchase Agreement) wherein GSVAM agreed to pay Bard up to $5 million, paid partially in monthly payments in exchange for Bard's ownership interest in GSVAM. Defendants admit Bard and Moe (who signed in his capacity as managing member of GSVAM) signed the Repurchase Agreement. Defendants deny the remaining allegations in paragraph 80 of the FAC.

81. Defendants admit Bard transferred his ownership interest in GSVAM back to GSVAM. Defendants deny the remaining allegations of paragraph 81 of the FAC.

82. Paragraph 82 calls for a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 82 of the FAC.

83. Defendants deny the allegations of paragraph 83 of the FAC.

84. Defendants deny the allegations of paragraph 84 of the FAC.

85. Defendants deny the allegations of paragraph 85 of the FAC.

86. Defendants deny the allegations of paragraph 86 of the FAC.

87. Defendants deny the allegations of paragraph 87 of the FAC.

88. Defendants deny the allegations of paragraph 88 of the FAC.

89. Defendants deny the allegations of paragraph 89 of the FAC.

90.     Defendants deny the allegations of paragraph 90 of the FAC.

91.     Defendants deny the allegations of paragraph 91 of the FAC.

92.     Defendants deny the allegations of paragraph 92 of the FAC.

93.     Defendants incorporate by reference all preceding paragraphs as though fully set forth herein.

94.     Defendants admit Plaintiff alleges he is entitled to reformation of the Repurchase Agreement. Defendants deny the remaining allegations in paragraph 94 of the FAC.

95.     Defendants deny the allegations of paragraph 95 of the FAC.

96.     Defendants deny the allegations of paragraph 96 of the FAC.

97.     Defendants admit the Repurchase Agreement was effective on September 18, 2017. Defendants deny the remaining allegations in paragraph 97 of the FAC.

98.     Defendants deny the allegations of paragraph 98 of the FAC.

99.     Defendants deny the allegations of paragraph 99 of the FAC.

100.    Defendants deny the allegations of paragraph 100 of the FAC.

101.    Defendants admit that on November 4, 2022, Bard sent a letter to GSVAM. Defendants deny the remaining allegations of paragraph 101 of the FAC.

102.    Defendants admit GSVAM will not modify the parties' written agreement. Defendants deny the remaining allegations of paragraph 102 of the FAC.

103.    Defendants deny the allegations of paragraph 103 of the FAC.

104.    Defendants deny the allegations of paragraph 104 of the FAC.

105.    Defendants deny the allegations of paragraph 105 of the FAC.

106.    Defendants deny the allegations of paragraph 106 of the FAC.

107.    Defendants incorporate by reference all preceding paragraphs as though fully set forth herein.

108.    Defendants lack sufficient information to admit or deny the allegations in paragraph 108 regarding Mark Klein's statements to Bard and on that basis deny them. Defendants deny the remaining allegations in paragraph 108 of the FAC.

109. Defendants admit that GSVAM's monthly payment obligations depend in part on revenues available to GSVAM. Defendants deny the remaining allegations in paragraph 109 of the FAC.

110. Defendants deny the allegations of paragraph 110 of the FAC.

111. Defendants deny the allegations of paragraph 111 of the FAC.

112. Defendants deny the allegations of paragraph 112 of the FAC.

113. Defendants deny the allegations of paragraph 113 of the FAC.

114. Defendants deny the allegations of paragraph 114 of the FAC.

115. Defendants deny the allegations of paragraph 115 of the FAC.

116. Defendants deny the allegations of paragraph 116 of the FAC.

117. Defendants deny the allegations of paragraph 117 of the FAC.

118. Defendants incorporate by reference all preceding paragraphs as though fully set forth herein.

119. Defendants admit that Defendants provided a link to HMF, but otherwise deny the allegations regarding HMF, Franco, and Held's access to the data room. Defendants deny the remaining allegations in paragraph 119 of the FAC.

120. Defendants deny the allegations of paragraph 120 of the FAC.

121. Defendants deny the allegations of paragraph 121 of the FAC.

122. Defendants deny the allegations of paragraph 122 of the FAC.

123. Defendants deny the allegations in paragraph 123 of the FAC.

124. Defendants incorporate by reference all preceding paragraphs as though fully set forth herein.

125. Defendants lack sufficient information to admit or deny the allegations in paragraph 125 and on that basis deny them.

126. Defendants lack sufficient information to admit or deny the allegations in paragraph 126 and on that basis deny them.

127.     Defendants lack sufficient information to admit or deny the allegations in paragraph 127 and on that basis deny them

128.     Defendants lack sufficient information to admit or deny the allegations in paragraph 128 and on that basis deny them.

129.     Defendants lack sufficient information to admit or deny the allegations in paragraph 129 and on that basis deny them

130.     Defendants lack sufficient information to admit or deny the allegations in paragraph 130 and on that basis deny them

131.     Defendants lack sufficient information to admit or deny the allegations in paragraph 131 and on that basis deny them

132.     Defendants lack sufficient information to admit or deny the allegations in paragraph 132 and on that basis deny them.

## AFFIRMATIVE DEFENSES

133.     Defendants also state the following affirmative defenses, and reserve the right to allege additional defenses as they become known, or as they evolve during the litigation, and to amend its Answer accordingly:

## FIRST AFFIRMATIVE DEFENSE

### Failure to State a Claim

134.     Plaintiff's FAC and each purported cause of action contained therein fails to state a claim or cause of action against Defendants upon which relief can be granted and/or fails to state facts sufficient to state a cause of action.

## SECOND AFFIRMATIVE DEFENSE

### Statute of Limitations (Fraud)

135.     Plaintiff's claims for fraud and aiding and abetting fraud are time barred by the statute of limitations given that the alleged harm occurred over six years ago.

## THIRD AFFIRMATIVE DEFENSE

### Waiver/Estoppel

136.     Plaintiff's FAC, and each cause of action asserted therein, is barred by the doctrine of waiver and estoppel by reason of Plaintiff's conduct, actions, omissions, and/or communications.

## FOURTH AFFIRMATIVE DEFENSE

### Unjust Enrichment

137.     Plaintiff's FAC and each purported cause of action contained therein are barred to the extent that any award in this action would constitute unjust enrichment.

## FIFTH AFFIRMATIVE DEFENSE

### Laches

138.     Plaintiff's FAC and his claim for reformation set forth therein are barred, in whole or in part, due to Plaintiff's unreasonable delay in acting upon the matters alleged in the FAC.

## SIXTH AFFIRMATIVE DEFENSE

### Unclean Hands

139.     Plaintiff's FAC and each purported cause of action contained therein are barred, in whole or in part, by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

### Good Faith

140.     Plaintiff's FAC and each purported cause of action contained therein are barred, in whole or in part, because Defendants had, and continue to have, a reasonable, good faith belief that GSVAM has the legal right to terminate payments under the language of the parties' Repurchase Agreement.

## EIGTH AFFIRMATIVE DEFENSE

### Reservation of Right

141.     Defendants presently have insufficient knowledge or information on which to form a belief as to whether it may have additional, and yet unstated, defenses available. Defendants

Defs.' Answer and Counterclaims to
Plaintiff's FAC
Case No.: 3:23-cv-00488-WHO

-15-

reserve the right to assert additional defense in the event discovery indicates they would be appropriate.

## COUNTERCLAIMS

Counterclaimant GSV Asset Management, LLC ("GSVAM" or "Company") hereby alleges for its counterclaims against Counterclaim-Defendant Stephen D. Bard ("Bard" or "Counterdefendant") as follows:

## THE PARTIES

1.      GSVAM is a Delaware limited liability company with its principal place of business in Dallas, Texas. GSVAM is an investment management firm dedicated to strategically investing client assets.

2.      Moe is a resident of Dallas, Texas. Moe is the Chief Executive Officer and co-founder of GSVAM. Moe is an investment professional, entrepreneur, and author with extensive experience serving at high-level roles in the investment space.

3.      Upon information and belief, Bard is a resident of Incline Village, County of Washoe, Nevada. Bard is a sophisticated businessperson, operating at senior roles including as the former Chief Operating Officer of GSVAM.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a). For purposes of Section 1332, GSVAM is both a foreign citizen and a citizen of Texas because a limited liability company "is a citizen of every state which its owners/members are citizens." *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). Counterdefendant is a citizen of Nevada. Therefore, complete diversity exists. Additionally, the amount in controversy here exceeds $75,000.

5.      This Court has personal jurisdiction over Bard because Bard availed himself of this Court's jurisdiction by filing his First Amended Complaint (ECF No. 48, "FAC") with this Court and because he has minimum contacts within this District.

Defs.' Answer and Counterclaims to
Plaintiff's FAC
Case No.: 3:23-cv-00488-WHO

-16-

6.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) because this Court has personal jurisdiction over Bard and because Bard filed the FAC in this District.

## BACKGROUND

### Founding of GSVAM

7.     In 2009, Moe and Bard co-founded GSVAM. GSVAM is an investment management and advising firm for sophisticated and fast-growing clients. Both Moe and Bard served as members of GSVAM, and Moe served as the Chief Executive Officer while Bard served as the Chief Operating Officer.

8.     Eventually, Bard and Moe's relationship soured, and Bard ceased having an operational role within GSVAM, though he retained an ownership interest. The dispute between the co-founders grew more contentious with time, resulting in years' worth of litigation, until September 18, 2017, when Bard and Moe settled their disagreements by executing a Stock Repurchase Agreement. *See* ECF No. 54-2 ("Repurchase Agreement").

### The Repurchase Agreement

9.     Under the terms of the Repurchase Agreement, Bard agreed to sell his interest in GSVAM back to the Company in exchange for a fee. That fee consisted of a $1.5 million upfront fee, and up to $3.5 million paid in monthly installments of $29,166.66. *See* Repurchase Agreement §§ 2-3.1.

10.     However, under Section 3.1(a) of the parties' Repurchase Agreement, the parties agreed to specific language providing GSVAM the flexibility to honor its contractual obligations while also maintaining business operations should the Company's circumstances change. More specifically Section 3.1(a) provides that:

> if, following the date hereof, . . . the "**Aggregate TTM Revenues**"[], received by the Company from the entities identified on <u>Annex A</u> hereto (the "*Identified Entities*") decrease[] below $2,500,000 . . . then the amount of the Recurring Payment Amount shall be reduced to an amount equal to the product obtained by *multiplying* (i) the Aggregate TTM Revenues *times* (ii) ten percent (10%) *times* (iii) one-twelfth (1/12). Repurchase Agreement § 3.1(a).

11.     This section explicitly authorizes GSVAM to lower its monthly payments to Bard should the aggregate revenues from the Identified Entities decrease below the $2.5 million threshold. *See* Repurchase Agreement § 3.1(a).

12.     On September 18, 2017, Bard executed the Repurchase Agreement and GSVAM provided uninterrupted payments for five years.

**Negotiations of the Repurchase Agreement**

13.     The parties began preliminary discussions about the possibility of executing a stock repurchase agreement in or around May of 2017.

14.     In May, during these early preliminary discussions, GSVAM gave Bard access to a data room where Bard could conduct due diligence, review company records, and access other potentially useful documents over the course of the negotiation of the Repurchase Agreement.

15.     In June 2017, both parties retained counsel to take over the negotiations and craft the exact terms of the parties' deal. Bard was represented by Cotchett, Pitre & McCarthy ("CPM").

16.     During the drafting process, Bard asked to personally bind Moe to the terms of the Repurchase Agreement and to expand the sources of revenue under Sections 3.1(a) and (b). GSVAM rejected Bard's proposals.

17.     Specifically, on July 19, 2017, Bard and his counsel requested a provision requiring Michael Moe to transfer his personal interests into GSVAM.

5.3     Obligations of Michael Moe.     The obligations of the Seller to effect the Repurchase are subject to: (a) Michael Moe transferring, at or before the Closing, all his ownership in any GSV entity to the Company, including, but not limited to: (i) GSV Summit LLC; (ii) "The Global Silicon Valley Handbook" (agreement dated May 31, 2016 with Grand Central Publishing); and (iii) GSV Acceleration Fund; (b) an agreement signed by the Company and Michael Moe to the effect that any entity in existence as of the Closing or in the future that is using "GSV" in its name will be owned by GSVAM, not Michael T. Moe; and (c) an agreement signed by the Company and Michael Moe to the effect that any entity in existence as of the Closing or in the future that is conducting business activity consistent with Section 1.6 of the GSV Asset Management, LLC Agreement ("Business of the Company") as amended July 1, 2011, will be owned by the Company, not Michael Moe.

Defs.' Answer and Counterclaims to
Plaintiff's FAC
Case No.: 3:23-cv-00488-WHO

-18-

18.     GSVAM responded a few days later rejecting Bard's insertion.

~~5.3     Obligations of Michael Moe.          The obligations of the Seller to effect the Repurchase are subject to: (a) Michael Moe transferring, at or before the Closing, all his ownership in any GSV entity to the Company, including, but not limited to: (i) GSV Summit LLC; (ii) "The Global Silicon Valley Handbook" (agreement dated May 31, 2016 with Grand Central Publishing); and (iii) GSV Acceleration Fund; (b) an agreement signed by the Company and Michael Moe to the effect that any entity in existence as of the Closing or in the future that is using "GSV" in its name will be owned by GSVAM, not Michael T. Moe; and (c) an agreement signed by the Company and Michael Moe to the effect that any entity in existence as of the Closing or in the future that is conducting business activity consistent with Section 1.6 of the GSV Asset Management, LLC Agreement ("Business of the Company") as amended July 1, 2011, will be owned by the Company, not Michael Moe.~~

19.     Similarly, on August 16, 2021, Bard attempted to broaden the definition of revenue sources under Section 3.1(a) from "all sources" plus any revenues "earned by Michael Moe," and requested similar language in Section 3.1(b).

> (a)     ~~i~~If, following the date hereof, the aggregate <u>revenues earned during</u> ~~the~~ ~~trailing~~ twelve-month <u>period s</u>immediately prior to ~~revenue, as of the end of any calendar month preceding~~ a Pay Due Date (such trailing twelve-month revenue<u>s shall be recognized on an accrual accounting basis in accordance with U.S. Generally Accepted Accounting Principles ("GAAP")</u>, as of the calendar month preceding such Pay Due Date, as determined from time to time, the "***Aggregate TTM Revenues***"), received by the Company <u>from all sources</u>, <u>plus any Aggregate TTM Revenues earned by</u>~~or~~ Michael T. Moe<u>,</u> from the entities identified on <u>Annex A</u> hereto (the "***Identified Entities***") ~~either (i) in its capacity as the asset manager of the Identified Entities, or, without duplication, (ii) The Global Silicon Valley Handbook, or, without duplication, (iii) pursuant to contractual arrangements between the Company, or Michael T. Moe, and the Identified Entities in effect on the date hereof,~~ decreases below $2,500,000 at any time or from time to time during any year, then the amount of the Recurring Payment Amount shall be reduced to an amount equal to the product obtained by *multiplying* (~~a~~<u>i</u>) the Aggregate TTM Revenues *times* (~~b~~<u>ii</u>) ten percent (10%) *times* (~~c~~<u>iii</u>) one-twelfth (1/12)~~; provided further, that~~ |

> (b)     <u>i</u>If, following the date hereof, ~~the Recurring Payment Amount is reduced pursuant to the foregoing proviso, and following such reduction~~ Aggregate TTM Revenues <u>received by the Company from all sources, plus any Aggregate TTM Revenues earned by</u>~~or~~ Michael T. Moe<u>,</u> from the Identified Entities, ~~pursuant to contractual arrangements~~ increase above $5,000,000 at any time or from time to time during any year, then the amount of the Recurring Payment Amount shall be increased to an amount equal to the product obtained by *multiplying* (~~a~~<u>i</u>) the Aggregate TTM Revenues *times* (~~b~~<u>ii</u>) ten percent (10%) *times* (~~c~~<u>iii</u>) one-twelfth (1/12)~~, until such time as the Seller has received monthly payments pursuant to this proviso in an amount sufficient to compensate the Seller for any reduction to the amount of the Recurring Payment Amount pursuant to the foregoing proviso.~~

20.     GSVAM rejected this attempt and others, ensuring Michael Moe was not a party to the Repurchase Agreement.

21.     GSVAM similarly rejected Bard's attempts to broaden the applicable sources of revenue under the Repurchase Agreement, striking out any reference to sources beyond that of the Annex A entities.

> (a)     ~~If~~ if, following the date hereof, the aggregate revenues earned during the twelve-month period immediately prior to a Pay Due Date (such trailing twelve-month revenues shall be recognized on an accrual accounting basis in accordance with U.S. Generally Accepted Accounting Principles ~~("GAAP")~~, as of the calendar month preceding such Pay Due Date, as determined from time to time, the "***Aggregate TTM Revenues***"), received by the Company ~~from all sources~~ from the entities identified on Annex A hereto (the "***Identified Entities***") decreases below $2,500,000 at any time or from time to time during any year, then the amount of the Recurring Payment Amount shall be reduced to an amount equal to the product obtained by *multiplying* (i) the Aggregate TTM Revenues *times* (ii) ten percent (10%) *times* (iii) one-twelfth (1/12)~~.~~; and

> (b)     ~~If~~ if, following the date hereof, Aggregate TTM Revenues received by the Company from ~~all sources from~~ the Identified Entities, increase above $5,000,000 at any time or from time to time during any year, then the amount of the Recurring Payment Amount shall be increased to an amount equal to the product obtained by *multiplying* (i) the Aggregate TTM Revenues *times* (ii) ten percent (10%) *times* (iii) one-twelfth (1/12), until such time as the Seller has received monthly payments pursuant to this Section 3.1(b) in an amount sufficient to compensate the Seller for any reduction to the amount of the Recurring Payment Amount pursuant to Section 3.1(a).

22.     Ultimately, Bard's counsel agreed to the narrowly defined revenue sources. Bard reviewed the contract with his counsel (Repurchase Agreement § 6.5) and the parties executed the Repurchase Agreement, dated September 18, 2017. GSVAM then furnished the $1.5 million upfront payment and $29,166.66 monthly for five years.

**Termination of SuRo Contract**

23.     From 2011 through 2019, GSVAM's largest source of revenue was the advising fees it earned from Suro Capital Corp. ("Suro," formerly "GSV Capital Corp."), who was listed in the Repurchase Agreement as an Annex A entity.

24.     But in 2019, SuRo unilaterally terminated GSVAM and decided to internalize GSVAM's advising role, poaching GSVAM's employees to do so. Despite suffering the catastrophic blow to the Company's revenue stream, GSVAM continued to pay Bard nearly $30,000 per month.

**Revenue From the Annex A Entities Dry Up**

25.     Over the course of the next few years, in large part due to SuRo's termination of GSVAM, GSVAM's trailing 12-month revenues earned from the Annex A entities began to drop significantly.

26.     From September 2020 onward, the revenue GSVAM received from the Annex A entities dipped below $2.5 million, which should have triggered the Repurchase Agreement's payment reduction provision. However, GSVAM continued paying Bard his regular monthly payment of $29,166.66.

27.     In October 2021, GSVAM's trailing 12-month revenues earned from the Annex A entities reached $0. At this point, under the terms of the parties' agreement, Bard was no longer entitled to *any* monthly payments. However, GSVAM continued paying Bard, and Bard continued accepting his nearly $30,000 of monthly payments.

**GSVAM Discovers Bard was Overpaid**

28.     In 2022, GSVAM's Chief Financial Officer reviewed the parties' Repurchase Agreement and the Company's financials and determined that GSVAM no longer was required to pay Bard. In fact, it was clear that the Company had actually *overpaid* Bard for years.

29.     According to its calculations, GSVAM overpaid Bard by $570,572.69 from September 2020 through September 2022 and underpaid Bard $81,897.54 from November 2018 through April 2019, meaning that the net overpayment amount was $488,675.16.

30.     GSVAM emailed Bard, informing him that GSVAM was overpaying Bard from September 2020 through September 2022 and attached a supporting profit and loss statement which revealed the revenue from GSVAM's various entities from November 2017 through September 2022, including all relevant calculations.

31.     In late 2022, Bard refused to return GSVAM's money, and instead filed suit claiming that the parties in fact agreed to a far more expansive interpretation of Section 3.1(a) despite the clear documentary evidence to the contrary.

32.     Despite Bard's awareness of the heavily negotiated terms of Section 3.1(a), and despite Bard's awareness that he was in fact overpaid for *years*, Bard refuses to remit payment for the $488,675.16 he owes GSVAM.

## FIRST COUNTERCLAIM

### Breach of Contract

33.     Counterclaimant GSVAM repeats and incorporates by reference allegations in paragraphs 1 through 32 of the Counterclaims above as if fully set forth herein.

34.     After extensive negotiations, Bard and GSVAM executed the Repurchase Agreement where Bard agreed that should the aggregate revenues "received by the Company from the entities identified on <u>Annex A</u> . . . decrease[] below $2,500,000," GSVAM would be contractually authorized to lower its monthly payments. Repurchase Agreement § 3.1(a).

35.     At all relevant times, GSVAM performed its obligations under the Repurchase Agreement, including by making a $1.5 million upfront payment, and $29,166.66 in monthly payments for five years.

36.     All conditions required for Bard's performance occurred or were excused.

37.     Bard breached the Repurchase Agreement by failing to return the overpaid funds back to GSVAM. In total, GSVAM overpaid Bard $488,675.16 from September 2020 through September 2022. Bard was not and is not contractually entitled to those payments, and by failing to remit the payments, he is in breach of his obligations under the parties' Repurchase Agreement.

38.     GSVAM has suffered damages as a result of Bard's breach of the Repurchase Agreement in an amount to be proven at trial.

## SECOND COUNTERCLAIM

### Unjust Enrichment

39.     Counterclaimant GSVAM repeats and incorporates allegations in paragraphs 1 through 38 of the Counterclaims above as if fully set forth herein.

40. Bard received a benefit from GSVAM, namely hundreds of thousands of dollars in monthly payments that GSVAM incorrectly paid Bard between September 2020 and September 2022.

41. In September 2022, Bard was alerted that the payments were erroneously made, and that Bard had in fact been overpaid by the Company by $488,675.16. And despite his awareness, Bard refuses to refund the payment at the expense of GSVAM.

42. Bard has been unjustly enriched by improperly retaining hundreds of thousands of dollars of GSVAM's funds.

43. GSVAM has suffered damages as a result of Bard's unjust retention of GSVAM's funds in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counterclaimant GSVAM pray for relief as follows:

1. That Plaintiff takes nothing by way of their action against Defendants;

2. That Plaintiff's FAC and each cause of action therein be dismissed in its entirety with prejudice;

3. That the Court award damages to GSVAM in an amount to be proven at trial;

4. That the Court award pre-judgment and post-judgment interest as allowed by law;

5. That Defendants recover their cost of suit incurred herein, including reasonable attorney's fees pursuant to applicable law;

6. That the Court awards such other and further relief that it deems just and proper.

## JURY DEMAND

Defendants and Counterclaimant GSVAM demand a jury trial of all causes of action asserted herein so triable.

///

Dated: September 25, 2023

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: /s/ *Dale Bish*
       Dale Bish

*Attorneys for Defendants*
GSV Asset Management, LLC and
Michael T. Moe